### UNITED STATES DISTRICT COURT
### DISTRICT OF KANSAS
### KANSAS CITY

YELLOWDOG PARTNERS, LP,
individually and on behalf of all
others similarly situated,

Plaintiffs,

v.

CURO GROUP HOLDINGS CORP.,
DONALD F. GAYHARDT,
WILLIAM BAKER, and
ROGER W. DEAN,

Defendants.

**Civil Action No. 18-2662**

**CLASS ACTION COMPLAINT
JURY TRIAL DEMANDED**

## CLASS ACTION COMPLAINT

Plaintiff Yellowdog Partners, LP ("Yellowdog"), individually and on behalf of all other persons similarly situated, for its Class Action Complaint against Defendants, alleges the following based upon personal knowledge as to itself and its own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through its attorneys, which included, among other things, a review of the Defendants' public documents and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Defendant Curo Group Holdings Corp. ("CURO" or the "Company"), news articles about the Company, and information readily obtainable on the Internet. Yellowdog believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**NATURE OF THE ACTION AND RELEVANT BACKGROUND**

1.      This is a federal securities class action on behalf of a class consisting of all persons other than Defendants (defined herein) who purchased or otherwise acquired CURO securities from July 31, 2018 through October 24, 2018, inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      By way of background, CURO provides short-term credit to underbanked consumers in the United States, the United Kingdom and Canada.  In the United States, it operates under two principal brands, "Speedy Cash" and "Rapid Cash." In the United Kingdom, CURO operates online as "Wage Day Advance" and "Juo Loans."  In Canada, the Company's stores are branded "Cash Money" and it offers "LendDirect" installment loans online and at certain stores.

3.      CURO offers "Single-Pay Loans," "Unsecured Installment Loans," "Open-End Loans" and "Secured Installment Loans."

4.      Single-Pay Loans are generally unsecured short-term, small-denomination loans whereby a customer receives cash in exchange for a post-dated personal check or a pre-authorized debit from the customer's bank account.  CURO agrees to defer deposit of the check or debiting of the customer's bank account until the loan due date, which typically falls on the customer's next pay date.  Historically, the fees for CURO's Single-Pay Loans were extremely high, ranging from $13-$25 per $100 borrowed.  Thus, these are high-yield products for the Company.

5.      Unsecured Installment Loans are fixed-term, fully amortizing loans with a fixed payment amount due each period during the term of the loan.  Loans are originated and owned by CURO or third-party lenders pursuant to credit services organization and credit access business statutes.  Payments are due bi-weekly or monthly to match the customer's pay cycle.  Customers may

prepay without penalty or fees.  Unsecured Installment Loan terms are governed by enabling state legislation in the United States, provincial and federal legislation and national regulations in Canada and national regulation in the United Kingdom.

6.     Open-End Loans are a line of credit for the customer without a specified maturity date. Customers may draw against their line of credit, repay with minimum, partial or full payment and redraw as needed.  CURO reports and earns interest on the outstanding loan balances drawn by the customer against their approved credit limit.  Customers may prepay without penalty or fees. Typically, customers do not draw the full amount of their credit limit.  Loan terms are governed by enabling state legislation in the United States.

7.     For the year ending December 31, 2017, Installment and Open-End Loans accounted for 68% of CURO's consolidated revenue.  CURO's Installment Loan products typically have longer terms, lower periodic payments and a lower relative cost.  Installment and Open-End products generally have lower yields than Single-Pay products, which necessitates more stringent credit criteria supported by more sophisticated credit analytics.

8.     As part of its business, CURO calculates up-front provision for loan losses based on evaluation of the historical and expected cumulative net losses inherent in the underlying loan portfolios, by vintage, and several other quantitative and qualitative factors.  CURO applies the resulting loss provision rate to its loan originations to determine the provision for losses. Accordingly, at the time CURO originates a loan, it recognizes a loss on a portion of the loan balance based upon the applicable loss provision rate.  CURO then recognizes any revenue in connection with that loan over the life of the loan. CURO may also record additional provision for losses for owned loans in connection with the periodic assessment of the adequacy of the allowance for loan losses.

9.    CURO's Ontario operations account for approximately two-thirds (2/3s) of the Company's Canadian revenue.

10.   This case concerns Defendants' materially false and misleading statements, including on-going financial guidance, relating to CURO's efforts to transition its Canadian inventory of products from Single-Pay Loans to Open-End Loans.  In this regard, throughout the Class Period, Defendants materially misrepresented to investors the deleterious effect that the up-front loan loss provisioning in connection with the transition was having on the Company's financial performance and 2018 full-year Company guidance.  Because CURO's Open-End Loans had a materially lower lending yield than the Single-Pay Products, and the portfolio of Open-End Loans was still immature and unseasoned, the up-front loan loss provisioning for these loans was far greater than publicly revealed (and the yield far lower).  This caused the Company to materially overstate its 2018 projected financial results, including CURO's adjusted EBITDA (earnings before interest, taxes, depreciation and amortization), net revenue and operating earnings.  As a result of these misrepresentations, CURO stock traded at artificially inflated price levels throughout the Class Period.

11.   During the Class Period, with the price of CURO stock artificially inflated, the Company undertook a $690 million debt offering.  Furthermore, during the Class Period, Defendant William Baker ("Baker"), the Company's Executive Vice President and Chief Operating Officer, reaped insider trading profits of over $1.7 million.

12.   The truth was revealed after the market closed on October 24, 2018, when CURO issued a press release announcing disappointing results for the Company's 2018 third quarter. Despite the bullish Class Period statements about the transition and the Company's financial guidance, *Canadian revenue decreased $4.4 million, or 8.8%*, to $46.2 million for the three months ended September 30, 2018 from $50.7 million in the prior year period; the *provision for losses*

*increased $8.7 million, or 55.5%,* to $24.4 million for the three months ended September 30, 2018 compared to $15.7 million in the prior year period because of upfront provisioning on Open-End loan volumes and mix shift from Single-Pay loans and Unsecured Installment to Open-End loans; *the cost of providing services in Canada increased $2.0 million, or 10.3%,* to $21.3 million for the three months ended September 30, 2018, compared to $19.3 million in the prior year period; *Canadian Adjusted EBITDA decreased $15.36 million from $11.9 million to ($3.39 million)* for the three months ended September 30, 2018, compared to the prior year period; *Canadian Net Revenue decreased $13.16 million, or 37.7%,* to $21.77 million from $34.94 million for the three months ended September 30, 2018, compared to the prior year period; and *Canadian Operating Income decreased $16.8 million from $10.9 million to ($5.8 million)* for the three months ended September 30, 2018, compared to the prior year period.

13.    In addition, after having then recently affirmed the Company's 2018 fiscal guidance when reporting CURO 2018 second quarter financial results, on or about October 25, 2018, Defendants announced the following substantially revised 2018 full-year Company financial guidance:

We now anticipate full-year 2018 guidance to be as follows:

Revenue in the range of $1.090 billion to $1.095 billion, increased from prior range of $1.025 billion to $1.080 billion

*Adjusted Net Income in the range of $88 million to $91 million compared to prior range of $110 million to $116 million*

*Adjusted EBITDA in the range of $215 million to $218 million compared to prior range of $245 million to $255 million*

Estimated tax rate of 25% to 27% for the full year

*Adjusted Diluted Earnings per Share of $1.84 to $1.88 compared to prior range of $2.25 to $2.40*

[Emphasis added.]

14.     Upon announcement of the Company's disappointing 2018 third quarter financial results and revised 2018 full-year guidance, the price of the Company's shares was decimated.  As illustrative, CURO stock closed at $22.87 on October 24, 2018,  the last day of the Class Period. After the truth was revealed, on October 25, 2018, the Company's shares closed sharply downward at $15.18 – *a staggering loss  of $7.69 per share*.

15.     Commenting on the 2018 third quarter results, analysts were quick to criticize the Company, including accusing Defendants of failing to provide earlier "visibility" for these results. For example, in a Stephens Inc. ("Stephens") report dated October 26, 2018, analyst Vincent Caintic stated that: "We lower our 2019E/2020E EPS by 28%/27% on higher credit provisions and lower asset yields with the Canadian line of credit product . . . *The miss and the resulting pain to CURO shares appears to be self- inflicted, driven by* 1) over aggressive growth in the Canadian line of credit product, and *2) a lack of visibility into the scenarios of the guide down, either at the 2Q18 call or during the debt raise*." [Emphasis added.]

16.     In fact, during the October 25, 2018 CURO conference call discussing the disappointing financial results, defendant Donald F. Gayhardt ("Gayhardt"), the Company's CEO, apologized for his "mistake" in having previously failed to explain the then-known finsncial consequences of the conversion of the Single-Pay product: "As I mentioned, Single Pay is our best performing product for a long period of time, but that nothing lasts forever.  And I think we've done a good job of putting the business on footing to really perform well for a long period of time up there. *So, I think it's – and look, I will absolutely – I think it's a very fair criticism that we did a less than stellar job of explaining in probably our July call, and even back into our April call what was going – the impact of this on sort of in the near term.  And then accelerated faster than we thought, our*

*people up there did a great job of customers, et cetera and probably didn't lay it out for everybody as explicitly as we probably should have.  And we'll try not to make that mistake again."* [Emphasis added.]

17.     Importantly, far from being a "mistake," defendant Baker admitted during the October 25, 2018 call, that *Defendants knew in July 2018, when reaffirming guidance for the rest of fiscal 2018, that CURO's Canadian results were going to be a disaster*:

> **William Baker**: *And Vince, if you just look at Canada, I mean, again, we're sensitive to the earnings impact and doing what we say we're going to do.  But I think if you just look at the loss in the quarter, I mean the majority of that actually came in July when we did it.*

[Emphasis added.]

18.     As a result of Defendants' wrongful acts and omissions, Yellowdog and the Class purchased CURO common stock at artificially inflated prices, causing economic harm and damage to Yellowdog and the Class.

## JURISDICTION AND VENUE

19.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule l0b-5 promulgated thereunder by the SEC, 17 C.F.R § 240.10b-5.

20.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

21.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b).  CURO is located in this District and its shares are traded in this District and many of the acts and practices complained of occurred in substantial part herein.

22.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

23.     Plaintiff Yellowdog is a limited partnership organized under the laws of Delaware, with its place of business in Seal Beach, California.

24.     Yellowdog purchased CURO securities during the Class Period, as set forth in its accompanying PSLRA certification, and was damaged thereby.

25.     Defendant CURO is a Delaware corporation maintaining its principal place of business at 3527 North Ridge Road, Wichita, Kansas.  CURO shares trade on  the New York Stock Exchange ("NYSE") under the ticker symbol "CURO."

26.     Defendant Gayhardt serves as President, Chief Executive Officer, and a director of CURO.

27.     Defendant Baker serves as the Executive Vice President and Chief Operating Officer of CURO.

28.     Defendant Roger W. Dean ("Dean") serves as Executive Vice President and Chief Financial Officer of Curo.

29.     Defendants Gayhardt, Baker and Dean are referred to herein as the "Individual Defendants."

## PRE-CLASS PERIOD STATEMENTS

30.     Prior to and during the Class Period, Defendants consistently touted the on-going success of the transition, reaffirmed the Company's 2018 full-year financial guidance, and down-played the adverse financial effects from the conversion of the Company's Canadian Single-Pay products to Open-Ended and Installment Loans.  Among other things, Defendants assured the

Company's investors that the upfront loan-provisioning would not have a material affect on CURO's business, financial results and projections during the transition.

31.     For example, prior to the start of the Class Period, during the April 27, 2018, CURO 2018 first quarter earnings conference call, Defendant Gayhardt sought to assure the market that CURO had fully accounted for the transition and loss provisioning in its modeling and guidance for fiscal full-year 2018:

> **Donald F. Gayhardt**: Yeah. Maybe you – so, you do today have the mix shift then obviously, on the – with the installment line of credit side, there are some of the upfront provisioning, so yeah, as that business is growing, ***the revenue and profitability from those products lag a little bit just because of the way you have to provision upfront.*** So, those are growing faster than and becoming a bigger part of the portfolio. So, there's still some of that. But we're also starting to sort of lapse and some growth in those products. So, I think we're kind of getting this, what I call a little bit of a normalized phase. If we're growing Revenues in the mid-teens, and a lot of that is consistent with the shift in the Installment of the credits, and we're starting to kind of normalize on those trends a little bit. ***Canada, as we mentioned, we are seeing much more pronounced kind of mix shift from Single-Pay to Installment, we went through that in Alberta, we're growing the LendDirect business in the stores, not online and in Ontario, which is about two-thirds of our overall Canadian business, you'll start to see more of that as well. So, it would be some of that provisioning, but I think we had anticipated that, and when we developed our forecast and our guidance, there's nothing really going on in terms of mix shift or the overall kind of growth trends, that's out of line with our forecast.*** So, I think there is – as I mentioned in my segment, the core we are going to take our customers in very good shape I mean, the CURO rates, our collection rates, the kind of the performance post delinquency, we tend to see really, really good numbers in recovery numbers, from delinquent balance and continue to be very, very strong. So – and we feel really, really good. ***I mean, I think we try to be really sort of [indiscernible] (25:17) and measured in the way we provisioned in this quarter, but we don't – I think part of it is that the overall customer behavior gives us the opportunity to sort of be fairly conservative with those numbers, and I think we feel really good about those trends for the rest of the year.***

[Emphasis added.]

9

32.     By reassuring investors that Defendants had properly accounted for up-front loan loss provisioning with respect to the Canadian conversion, Defendants were vouching for the accuracy of the Company's financial forecast modeling, and claiming that they took into account important trends in the business.  As explained below, however, Defendants materially mislead the market with their modeling and financial guidance, and statements about the transition.

## MATERIALLY FALSE AND MISLEADING
## STATEMENTS MADE DURING THE CLASS PERIOD

33.     The Class Period begins on July 31, 2018.  On that day, CURO issued a press release announcing its financial results for the second quarter of 2018, and doubled-down on its financial guidance for the remainder of fiscal year 2018 (the "July 31 Press Release").  Among other things, in the July 31 Press Release, the Company stated:

> "CURO continued its strong growth momentum in the second quarter of 2018" said Don Gayhardt, President and Chief Executive Officer. "We are pleased to announce year-over-year loan growth of 26.9% and sequential loan growth of 14.1%, adjusted earnings growth in the first half of 2018 of 18.9%, and the execution of a milestone bank partner agreement that allows us to expand our lending footprint in the U.S. ***Our momentum, improvement in credit metrics and solid loan growth has further bolstered our confidence in our full year earnings guidance***," Gayhardt concluded.

[Emphasis added.]

34.     Importantly, the July 31 Press Release also specifically affirmed the Company's previous guidance for fiscal 2018:

> **Fiscal 2018 Outlook**
>
> ***We affirm our full-year 2018 adjusted earnings guidance***, a non-GAAP measure that excludes the $11.7 million of debt extinguishment costs from the retirement of $77.5 million of the 12.00% Senior Secured Notes due 2022 and stock-based compensation.  Our solid

results for the first half of 2018 and above-expectation loan growth has further bolstered our confidence in our guidance.  Our full-year 2018 guidance is as follows:

Revenue in the range of $1.025 billion to $1.080 billion

**Adjusted Net Income in the range of $110 million to $116 million**

**Adjusted EBITDA in the range of $245 million to $255 million**

Estimated tax rate of 25% to 27% for the full year

**Adjusted Diluted Earnings per Share of $2.25 to $2.40**

[Emphasis added.]

35.     On the same day, July 31, 2018, CURO held a conference call with analysts and investors to discuss its financial results and operations.  The Individual Defendants participated on the call, among others.  Defendant Gayhardt made numerous bullish statements about the Company's on-going Canadian transition and fiscal 2018 full-year guidance.  For example, defendant Gayhardt stated:

> I will characterize our second quarter in two ways, first from an operational standpoint, we had an excellent quarter.  **We made great progress on our new loan products, our MetaBank relationship and probably most importantly the early stage of a very successful introduction transition of a big part of our Ontario lending business of the legacy single-pay loan product to a line of credit product that's been very well received by our customers . . . but the big undertaking is going very well and is running well ahead of schedule.  We did all of this while maintaining our credit and other financial disciplines . . . . We are affirming our guidance today . . . we have a very high degree of confidence in achieving our guidance objectives and obviously, today we're about 60% of the way through the year so that certainly helps, and our confidence in our core business and products is very high . . . . and we believe that there is a good likelihood that we will come out ahead on our internal forecast and our published guidance.**

[Emphasis added.]

36.     Furthermore, Defendant Dean, CURO's CFO, in addition to specifically affirming CURO's 2018 full-year financial guidance, touted that CURO's Adjusted EBITDA would exceed

the amount realized throught the first six months of 2018, and, thus, would reverse the trend in 2017

when CURO achieved higher Adjusted EBITDA in the first six months of the year:

> ***Finally, I'll close with our full-year outlook for 2018.***  Like Don
> mentioned, we are affirming our full-year 2018 adjusted earnings
> guidance, that's a non-GAAP measure that excludes one-time items
> like the aforementioned share-based compensation.  We continue to
> anticipate revenue in the range of $1.25 [ph] billion to $1.80 [ph]
> billion with continued solid growth in the U.S. and UK being offset
> partially by ***modest declines in Canada from the additional regulatory
> changes and mix shift there.***  In fact, if you do the first half, second
> half math at this point we'd be surprised if we weren't already at the top
> end of the revenue guidance range.  ***Our adjusted EBITDA will fall in
> the range of $245 million to $255 million and our adjusted net
> income will be in the range of $110 million to $116 million with
> adjusted diluted earnings per share in the range of $2.25 to $2.40.
> One other thing to point out about the full year, if you look at our last
> year numbers, adjusted EBITDA for the first half of the year was
> higher than the second half of the year, there's a lot of reasons for
> that, but our guidance for this year implies that will flip this year.
> In other words, we reported $124 million of adjusted EBITDA
> through the first six months of 2018. At the midpoint of our guidance
> that means we would exceed $126 million of adjusted EBITDA for
> the second half of the year with related higher year-over-year growth
> rates.***

[Emphasis added.]

     37.    Defendants Gayhardt and Dean also assured investors that the up-front loan loss

provisioning from the Canadian product transition would be in-line (and "less noisy") with

expectations (*e.g.*, the same ratio of revenue to loss provision seen in the first half of 2018):

> **Don Gayhardt, President and Chief Executive Officer**
> So, but again there is mention – there is the pretty meaningful change,
> two-thirds of Ontario is a big piece of – Ontario, Canada last year – just
> in context – again, we gave you the full segment details of the Canada
> last year (inaudible) $186 million in revenue.  We think that's still
> going to grow – top line Canada is going to grow by 7%, we are talking
> about transitioning two-thirds of that P&L from a product standpoint.
> I think that just gives you a sense of why we're just a little – we just
> want to make sure we're just a little cautious in terms of – ***we are really
> happy with where things are going, but we don't want to – despite the
> ball at the 10 yard line here in terms of over promising on and over***

*projecting on what's happening in Canada, other than to say where we're really happy with those, current team has done a great job.  So that's kind of the top line, we would also expect – Roger, we would expect that our provision in the second half of the year would run about which revenue.*

**Roger Dean, Chief Financial Officer**
*It will be much closer and much less noisy than the first half of […]*

**Don Gayhardt, President and Chief Executive Officer**
*Right, exactly.  So again in the context of first half, your revenue grew 15.7%, provision grew 36%.  So revenue is going to grow in that 15% range, 14% to 15% range, provision grows in that, so your net revenue growth should run about with gross revenue growth.*

[Emphasis added.]

38.    Finally, Defendant Baker tried to allay analyst concerns about the Single-Pay decline due to the transition: "I mean I think when we ran the test and we did 21 test stores in Ontario, starting in February, and what we experienced there with single pays, we did see a decline due to all the things that Don just talked about the line of credit, ***but we did see it start to come back and we expect to see the same thing in the broader Ontario roll out.  So, we actually built the model to allow for that*** . . . " [Emphasis added.]

39.    The statements referenced in paragraphs 33-38 above were materially false and misleading when made because they failed to disclose the following adverse facts and trends, which were known to defendants or recklessly disregarded by them:

(a) The conversion from Single-Pay Loans to Open-End Loans was materially undermining CURO's on-going financial performance and 2018 full-year guidance, including massively diluting the Company's Adjusted EBITDA and net revenue, along with creating a significant operating loss, due to: (i) materially higher upfront loan loss provisioning on the Open-End Loans; (ii) materially reduced higher yielding Single-Pay Loans; (iii) materially reduced yield on the Open-End Loans; and (iv)

lower remaining Single-Pay yield due to required Canadian rate reductions (which regulations were known to defendants prior to the Class Period).

(b)   Thus, CURO's 2018 full-year fiscal guidance, and bullish statements about the transition, were materially false and misleading.

40.   Moreover, Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303(a)(3)(ii), requires Defendants to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on the sales or revenues or income from continuing operations."  The failure of the Company's 2018 second quarter 10-Q, filed with the SEC on or about November 1, 2018, to disclose the facts listed in ¶39 violated 17 C.F.R. §229.303(a)(3)(ii), because these undisclosed facts were known to Defendants and would (and did) have an unfavorable impact on the Company's sales, revenue and income from continuing operations.

41.   On or about August 13, 2018, the Company issued $690 million of 8.25% Senior Secured Notes due September 1, 2025 ("8.25% Senior Secured Notes").

**THE TRUTH IS REVEALED**

42.   On or about October 24, 2018, after the market closed, CURO announced its financial results for the quarter ended September 30, 2018, and provided substantially revised downward financial guidance for the remainder of 2018 (the "October 24 Press Release").  The Company's quarterly financial results were a disaster and the revised guidance was even worse.

43.   With regard to the financial results for the quarter ending September 30, 2018, the October 24 Press Release stated that:

> We were pleased with our team's ability to drive robust loan growth ahead of plan in all three countries in the third quarter, *but this rate of growth resulted in elevated provisioning levels which drove earnings below our expectations.  Results were particularly affected by the acceleration of Open-End loan product in Canada where we added*

14

> ***$87.4 million of Open-End loan balances during the third quarter, which well exceeded our expectations.  The related upfront loan loss provisioning caused Canadian net revenue and Adjusted EBITDA to drop by $10.9 million and $13.2 million sequentially, respectively, compared to the second quarter of 2018.***

[Emphasis added.]

44.     Despite Defendants then recently affirmed financial guidance and bullish statements about the Canadian transition, the October 24 Press Release disclosed that ***Canadian revenue decreased $4.4 million, or 8.8%***, to $46.2 million for the three months ended September 30, 2018 from $50.7 million in the prior year period; the ***provision for losses increased $8.7 million, or 55.5%***, to $24.4 million for the three months ended September 30, 2018 compared to $15.7 million in the prior year period because of upfront provisioning on Open-End loan volumes and mix shift from Single-Pay loans and Unsecured Installment to Open-End loans; ***the cost of providing services in Canada increased $2.0 million, or 10.3%***, to $21.3 million for the three months ended September 30, 2018, compared to $19.3 million in the prior year period; ***Canadian Adjusted EBITDA decreased $15.36 million from $11.9 million to ($3.39 million)*** for the three months ended September 30, 2018, compared to the prior year period; ***Canadian Net Revenue decreased $13.16 million, or 37.7%***, to $21.77 million from $34.94 million  for the three months ended September 30, 2018, compared to the prior year period; and ***Canadian Operating Income decreased $16.8 million from $10.9 million to ($5.8 million)*** for the three months ended September 30, 2018, compared to the prior year period.

45.     Most importantly, according to the October 24 Press Release, the guidance for fiscal year 2018 was revised from July 31, 2018 in the following respects:

> Fiscal 2018 Outlook
>
> The Company is revising its full-year 2018 adjusted earnings guidance, a non-GAAP measure that excludes $11.7 million of debt extinguishment costs from the retirement of $77.5 million of the

12.00% Senior Secured Notes due 2022 in the first quarter of 2018, $71.0 million of such costs from the retirement of the remaining $527.5 million of these notes in the third quarter of 2018, $10.0 million of debt extinguishment costs expected relating to the repayment in full of the US SPV Facility in the fourth quarter of 2018, third and fourth quarter 2018 U.K. customer redress costs, $1.2 million of tax expense related to the 2017 Tax Act and $1.2 million of net benefits from adjustment of legal settlement liabilities, stock-based compensation and intangible asset amortization.  We now anticipate full-year 2018 guidance to be as follows:

Revenue in the range of $1.090 billion to $1.095 billion, increased from prior range of $1.025 billion to $1.080 billion

***Adjusted Net Income in the range of $88 million to $91 million compared to prior range of $110 million to $116 million***

***Adjusted EBITDA in the range of $215 million to $218 million compared to prior range of $245 million to $255 million***

Estimated tax rate of 25% to 27% for the full year

***Adjusted Diluted Earnings per Share of $1.84 to $1.88 compared to prior range of $2.25 to $2.40***

[Emphasis added.]

46.     Defendant Gayhardt began the earnings call held on October 25, 2018 with "***From the top, I think it's important to acknowledge that this quarter fell short of our expectations and probably your expectations, and quite simply it's not up to our standards. . . . from the standpoint of operating earnings, we're about $17 million or $18 million short of our expectations and approximately $12 million of that relates to our ongoing Canadian product migration and increased loan loss provisions related to higher-than-expected loan growth. . . . By far the biggest impact of quarterly results was the ongoing product migration in Canada, specifically in the province of Ontario.  For reference, Ontario accounts for approximately two-thirds of our Canadian business . . . The downside of course that was dramatically reducing our Canadian Single-Pay revenue, which historically has been our most profitable single line of business, very high yields with modest and very consistent credit losses but a business line which is impacted by***

*steady run of provincial regulatory reviews that resulted in lower fees and a range of other provisions and increased operational complexities and reduced the attractiveness of the Single-Pay product to our Canadian consumers.* [Emphasis added.]

47.     Defendant Dean stated that: "***The Canadian business missed adjusted EBITDA by $12.1 million on loan portfolio mix shift and upfront provisioning on acceleration of Open-End in Ontario.*** The UK was slightly behind after adjusting for redress cost mostly on provisioning on loan growth." [Emphasis added.]

48.     During the call, after a question posed by analyst John Hecht of Jefferies, Defendant Dean disclosed the materially higher loss provisioning associated with the transition to the Canadian "unseasoned" and "immature" Open-End products:

> **Roger W. Dean**: Yeah. So, the Open-End product in Canada, the lending yield on the product is just under 50% annualized.  And then, we offer a true credit protection insurance product there.  It's optional customers opt-in.  And based on the acceptance rates, the insurance product drives the total financial yield on the product.  So, something in the 60% to low 60% range on an annualized basis.  ***Right now, our expectation would be that as the portfolio seasons, the losses on that portfolio would be in the low 20s. So, you got low 60s yield, low 20s losses. They're higher than that now because of the portfolios immature.  And we probably think it takes six to nine months for the losses to start to stabilize down in that range that I just mentioned.***
>
> **John Hecht**: And that compares to what range of losses in the prior port**?**
>
> **Donald F. Gayhardt**: So, John, this is Don.  The Single-Pay book [indiscernible] (00:29:48) the annualized charge-off in the Single-Pay book run about 50%.
>
> **John Hecht**: Okay.
>
> **Donald F. Gayhardt**: So that the yield – now again that the yield a little bit was higher than that, obviously the yield will come down as the provinces lower the lending caps.  ***So this product, you'll get higher average balances, lower yields, lower losses.  So, losses as a***

> ***percentage of revenue in this book will still run higher. They run about low 20s as a percentage of revenue in the Single-Pay book. But as Roger went through, you get 60-ish, low 60s yield, low 20s charge-offs you're going to get about 30% to 35% losses as a percentage of revenue***.

[Emphasis added.]

49.     When Defendants were asked by analyst Vincent Caintic about what had changed inter-quarter to materially affect the Company's previous guidance, Defendants blamed the conversion and the loan loss provisioning:

> **Vincent Caintic**: Okay. Thanks. Good morning, guys. So, I want to focus on the 2018 EPS guidance and also what that implies for 2019. ***So, first off, maybe if you can just give a retrospective here of the differences between your prior guidance and your updated guidance and what changed the inter-quarter?*** Understanding there's a lot of Canadian growth here, maybe if you can kind of parse out what changed and why you're thinking between what changed things.

> **Roger W. Dean**: Yeah. It's Roger. Good morning. Yeah. No, I think, ***as I mentioned in my prepared remarks, we missed our expectation by $17 million, $18 million for the quarter, two-thirds three quarters of that was with Canada and the combination in Canada was not just the provisioning on the loan book, but I also mentioned that our Single-Pay balance was [ph] illiquidated (00:49:52) or converted almost $12 million of Single-Pay balances. So in the quarter, the revenue was well below our expectations from that conversion and the provision was much higher***.

[Emphasis added.]

50.     Importantly, defendant Baker acknowledged during the October 25, 2018 call, that ***they knew in July 2018, when reaffirming guidance for the remainder of fiscal 2018, that CURO's Canadian results were going to be a disaster***:

> **William Baker**: *And Vince, if you just look at Canada, I mean, again, we're sensitive to the earnings impact and doing what we say we're going to do.* ***But I think if you just look at the loss in the quarter, I mean the majority of that actually came in July when we did it.***

[Emphasis added.]

51.     Although Defendant Baker admitted that most of the losses came in July 2018, he reaped insider trading profits during the Class Period of over $1.7 million.  In this regard, pursuant to a 10b5-1 insider trading plan (adopted on or about August 2, 2018), on or about September 25, 2018, Baker exercised options (priced at $0.85 each) and then sold 56,844 shares of CURO stock, yielding insider trading profits of over $1.7 million.  Specifically, Baker sold 51,168 CURO shares at a weighted average price of $31.57 per share, and sold 5,676 CURO shares at a weighted average price of $31.17 per share.  Pursuant to this insider trading transaction, Baker disposed of nearly one-third of his then-existing CURO shares (as a result of this transaction, Baker's CURO share ownership decreased from 183,699 to 132,511 shares).

52.     Not surprisingly, CURO's stock price dropped sharply on the news of the disappointing quarterly results and the revised guidance.  As illustrative, CURO stock closed on the last day of the Class Period at $22.87 on October 24, 2018, and closed at $15.18 on October 25, 2018, after the news was released – a staggering loss  of $7.69 per share.

53.     Commenting on the disappointing results, analysts were quick to criticize the Company, including Defendants failing to provide "visibility" earlier for the 2018 third quarter results.  For example, in a Stephens report dated October 26, 2018, analyst Vincent Caintic stated that:

> We lower our 2019E/2020E EPS by 28%/27% on higher credit provisions and lower asset yields with the Canadian line of credit product.  Contrary to our initial impressions, the weak earnings trends of 3Q18 are likely to persist through 2019E and perhaps into 2020E.  **The miss and the resulting pain to CURO shares appears to be self-inflicted, driven by** 1) over aggressive growth in the Canadian line of credit product, and 2) **a lack of visibility into the scenarios of the guide down, either at the 2Q18 call or during the debt raise**.

[Emphasis added.]

54.     During the October 25, 2018 CURO earnings' conference call discussing the disappointing financial results, defendant Gayhardt apologized for his "mistake" in failing to explain earlier the then-known consequences of the conversion of the Single-Pay product: "As I mentioned, Single Pay is our best performing product for a long period of time, but that nothing lasts forever.  And I think we've done a good job of putting the business on footing to really perform well for a long period of time up there.  *So, I think it's – and look, I will absolutely – I think it's a very fair criticism that we did a less than stellar job of explaining in probably our July call, and even back into our April call what was going – the impact of this on sort of in the near term.  And then accelerated faster than we thought, our people up there did a great job of customers, et cetera and probably didn't lay it out for everybody as explicitly as we probably should have.  And we'll try not to make that mistake again."* [Emphasis added.].

55.     As explained herein, given that a massive amount of losses came in July 2018, and were know to Defendants when affirming the full-year guidance on July 31, 2018, this was far from a "mistake."

**ADDITIONAL SCIENTER ALLEGATIONS**

56.     As alleged herein, Defendants acted with scienter in that Defendants knew, or recklessly disregarded, that the public documents and statements they issued and disseminated to the investing public in the name of the Company during the Class Period were materially false and misleading.  Defendants knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements and documents as primary violations of the federal securities laws.  Defendants, by virtue of their receipt of information reflecting the true facts regarding CURO and

the results of the Company's financial results, were active and culpable participants in the fraud alleged herein.

57.   Importantly, based on knowedge of the aforementioned undisclosed facts, during the Class Period, Defendant Baker reaped insider trading profits of over $1.7 million.

58.   During the Class Period, Defendants also issued $690 million worth of 8.25% Senior Secured Notes.

59.   Defendants knew and/or recklessly disregarded the false and misleading nature of the information which they caused to be disseminated to the investing public.  The fraud described herein could not have been perpetrated during the Class Period without the knowledge and complicity or, at least, the reckless disregard of personnel at the highest levels of the Company, including the Individual Defendants.

60.    The Individual Defendants, because of their positions with CURO, controlled the financial contents of the Company's public statements during the Class Period.  The Individual Defendants was provided with or had access to copies of the documents alleged herein to be false and/or misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.

61.   Because of their positions and access to material non-public information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations that were being made were false and misleading.  As a result, the Individual Defendants are responsible for the accuracy of CURO's corporate statements and are therefore responsible and liable for the misrepresentations contained therein.

21

62.     Furthermore, Defendants knew or were severely reckless in disregarding that the statements were materially false and misleading and/or omitted to state other facts necessary to make the statements made not misleading because at all relevant times, they were aware of, or recklessly disregarded, the actual facts.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

63.     Yellowdog brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise CURO securities during the Class Period (the "Class") and were damaged thereby.  Excluded from the Class are Defendants herein, the officers and directors of the Company, members of their immediate families and their legal representatives, heirs, successors or assigns, or any entity in which Defendants have or had a controlling interest.

64.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, CURO shares were actively traded on the NYSE. While the exact number of Class members is unknown to Yellowdog at this time and can be ascertained only through appropriate discovery, Yellowdog believes that there are thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by CURO or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

65.     Yellowdog's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

66.     Yellowdog will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Yellowdog has no interests antagonistic to or in conflict with those of the Class.

22

67.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by defendants to the investing public during the Class Period misrepresented the results of the Company's financial results and guidance;

- whether the Individual Defendants caused CURO to issue false and misleading statements during the Class Period;

- whether defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of CURO securities during the Class Period were artificially inflated because of the defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

68.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

69.     Based upon the foregoing, Yellowdog and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

### APPLICABILITY OF PRESUMPTION OF RELIANCE

70.     Yellowdog is entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 1288 (1972) because the claims asserted herein against Defendants are predicated upon omissions of material fact that there was a duty to disclose.

23

71.     In the alternative, Yellowdog is entitled to a presumption of reliance on Defendants' material misrepresentations and omissions pursuant to the fraud on the market doctrine for the following reasons set forth below.

72.     The market for CURO's securities was open, well-developed and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, the securities traded at artificially inflated prices during the Class Period, Yellowdog and other members of the Class purchased or otherwise acquired the securities relying upon the integrity of the market price of the securities and market information relating to the Company's financial results and guidance and have been damaged hereby.

73.     During the Class Period, the artificial inflation of the securities was caused by the material misrepresentations and omissions particularized in this Complaint and caused the damages sustained by Yellowdog and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about the Company's financial results and prospects.  These material misstatements and/or omissions created an unrealistically positive assessment of the Company and its business, operations, and prospects, thus causing the price of the securities to be artificially inflated at all relevant times, and when disclosed negatively affected their value.  Defendants' materially false and/or misleading statements during the Class Period resulted in Yellowdog and other members of the Class purchasing the securities at such artificially inflated prices, and each of them has been damaged as a result.

74.     At all relevant times, the market for CURO's common stock (and other securities) was an efficient market for the following reasons, among others:

(a) The Company's common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b) As a regulated issuer, CURO filed periodic public reports with the SEC and/or the NYSE;

(c) Defendants regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d) CURO was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

75.     As a result of the foregoing, the market for the securities promptly digested current information regarding CURO from all publicly available sources and reflected such information in the price of the securities.  Under these circumstances, all purchasers of CURO securities during the Class Period suffered similar injury through their purchases thereof at artificially inflated prices and are entitled to a presumption of reliance.

## LOSS CAUSATION

76.     Defendants' wrongful conduct as alleged herein directly and proximately caused the economic loss suffered by Yellowdog and the Class.  During the Class Period, Yellowdog and the Class purchased CURO securities at artificially inflated prices and were damaged thereby.  The price of CURO securities significantly declined when the true information was revealed, causing

investors' losses.  Following disclosure of the Company's financial results and revised guidance, the price of CURO's common stock (as well as its other securities) declined sharply on heavy trading volume of almost 3 million shares.

## NO SAFE HARBOR

77.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.   In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by executive officers of  CURO who knew that the statement was false when made.

## COUNT I

### (Against All Defendants For Violations of Section 10(b)
### And Rule 10b-5 Promulgated Thereunder)

78.    Yellowdog repeats and realleges each and every allegation contained above as if fully set forth herein.

79.    This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

80.     During the Class Period, Defendants: (1) engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Yellowdog and the other members of the Class; (2) made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (3) employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Yellowdog and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of CURO's securities; and (iii) cause Yellowdog and other members of the Class to purchase CURO securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants took the actions set forth herein.

81.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the SEC filings, press releases and other statements and documents described above.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about CURO financial results and guidance.

82.     By virtue of their positions at CURO, the Individual Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Yellowdog and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions

of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each

defendant knew or recklessly disregarded that material facts were being misrepresented or omitted

as described above.

83.    Information showing that Defendants acted knowingly or with reckless disregard for

the truth is peculiarly within Defendants' knowledge and control.  As the principal officers of

CURO, the Individual Defendants had knowledge of the details of CURO's internal financial affairs

and the Company's financial results and prospects.

84.    The Individual Defendants are liable both directly and indirectly for the wrongs

complained of herein.  Because of their positions of control and authority, the Individual Defendants

were able to and did, directly or indirectly, control the content of the statements of CURO (including

the Company's guidance).  As officers of a publicly-held company, the Individual Defendants had

a duty to disseminate timely, accurate, and truthful information with respect to CURO's businesses,

operations, future financial condition, future prospects and the Company's financial results.  As a

result of the dissemination of the aforementioned false and misleading reports, releases and public

statements, the market price of CURO securities was artificially inflated throughout the Class

Period.  In ignorance of the adverse facts concerning the Company's financial results, Yellowdog

and the other members of the Class purchased CURO securities at artificially inflated prices and

relied upon the price of the securities, the integrity of the market for the securities and/or upon

statements disseminated by Defendants, and were damaged thereby.

85.    During the Class Period, CURO common stock (and other securities) was traded on

an active and efficient market.  Yellowdog and the other members of the Class, relying on the

materially false and misleading statements described herein, which the Defendants made, issued or

caused to be disseminated, or relying upon the integrity of the market, purchased CURO securities

at prices artificially inflated by Defendants' wrongful conduct.  Had Yellowdog and the other members of the Class known the truth, they would not have purchased said securities or would not have purchased them at the inflated prices that were paid.  At the time of the purchases by Yellowdog and the Class, the true value of CURO securities was substantially lower than the prices paid by Yellowdog and the other members of the Class.  The market price of CURO securities declined sharply upon public disclosure of the facts alleged herein to the injury of Yellowdog and Class members.

86.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

87.    As a direct and proximate result of Defendants' wrongful conduct, Yellowdog and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period, upon the disclosure that the Company had disseminated false financial statements and projections to the investing public.

## COUNT II

### (Against the Individual Defendants for Violations of
### Section 20(a) of the Exchange Act)

88.    Yellowdog repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

89.    During the Class Period, the Individual Defendants participated in the operation and management of CURO, and conducted and participated, directly and indirectly, in the conduct of CURO's business affairs, including projecting and reporting the Company's financial results. Because of their senior positions, the Individual Defendants knew the adverse non-public information regarding CURO and its actual and projected financial results.

90.     As officers of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to CURO's financial condition and the Company's financial results, and to correct promptly any public statements issued by CURO which had become materially false or misleading.

91.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which CURO disseminated in the marketplace during the Class Period concerning CURO's financial prospects.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause CURO to engage in the wrongful acts complained of herein.  The Individual Defendants therefore, were "controlling persons" of CURO within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of CURO securities.

92.     The Individual Defendants, therefore, acted as controlling persons of CURO.  By reason of their senior management positions at CURO, the Individual Defendants had the power to direct the actions of, and exercised the same to cause, CURO to engage in the unlawful acts and conduct complained of herein.  The Individual Defendants exercised control over the financial operations of CURO and possessed the power to control the specific activities which comprise the primary violations about which Yellowdog and the other members of the Class complain.

93.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by CURO.

## PRAYER FOR RELIEF

WHEREFORE, Yellowdog demands judgment against Defendants as follows:

A.  Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Yellowdog as the Class representative;

B.  Requiring Defendants to pay damages sustained by Yellowdog and the Class by reason of the acts and transactions alleged herein;

C.  Awarding Yellowdog and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.  Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: December 5, 2018

   _/s/ Ryan C. Hudson_____
**REX A. SHARP P.A.**
Ryan C. Hudson         KS#22986
Larkin E. Walsh         KS#21855
5301 W. 75th Street
Prairie Village, KS 66208
T: (913) 901-0505
F: (913) 901-0419
rhudson@midwest-law.com
lwalsh@midwest-law.com

**KELLER LENKNER LLC**
Ashley C. Keller
Travis D. Lenkner
Seth A. Meyer
150 N. Riverside Plaza, Suite 4270
Chicago, IL 60606
T: (312) 741-5222
ack@kellerlenkner.com
tdl@kellerlenkner.com
sam@kellerlenkner.com

31

**KELLER LENKNER LLC**
U. Seth Ottensoser
1330 Avenue of the Americas
New York, NY 10019
T: (212) 653-9715
so@kellerlenkner.com

*Counsel for Plaintiff*