UNITED STATES DISTRICT COURT

DISTRICT OF KANSAS

KANSAS CITY

| | |
|---|---|
| YELLOWDOG PARTNERS, LP, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br> CURO GROUP HOLDINGS CORP., *et al.*, <br><br> Defendants. | Civil Action No. 2:18-cv-02662-JWL-KGG <br><br> <u>CLASS ACTION</u> |

**LEAD PLAINTIFF'S CONSOLIDATED COMPLAINT
<u>FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS</u>**

# TABLE OF CONTENTS

**Page**

I.      NATURE OF THE ACTION .................................................................................1

II.     JURISDICTION AND VENUE ............................................................................8

III.    PARTIES ...............................................................................................................9

    A.      Lead Plaintiff .............................................................................................9

    B.      Defendants .................................................................................................9

        1.      Corporate Defendant ......................................................................9

        2.      Individual Defendants ....................................................................9

        3.      Founder Defendants ......................................................................12

        4.      FFL Defendants ............................................................................13

IV.     SUBSTANTIVE ALLEGATIONS .....................................................................14

    A.      Background on Curo .................................................................................14

    B.      Tightening Payday Lending Regulations in Canada Threaten Curo's Most
        Profitable Line of Business, Canadian Payday Loans ...........................17

    C.      Curo Starts to Transition Customers in Canada from Single-Pay to
        Installment and Open-End Loans .............................................................20

    D.      Curo Rapidly Completes the Transition to Open-End Loans in Ontario, but
        Conceals the Negative Financial Impact from the Transition and Reaffirms
        Guidance for 2018 ....................................................................................22

    E.      Curo Completes a $690 Million Senior Secured Notes Offering and Baker
        Sells Over $1 Million in Curo Stock ........................................................26

    F.      Curo Reports EPS Below Analysts' Consensus and Reduces FY18
        Guidance as a Result of the Transition to Open-End Loans in Canada .............27

    G.      Post-Class Period Revelations ................................................................29

V.      MATERIALLY FALSE OR MISLEADING STATEMENTS AND OMISSIONS
      ISSUED DURING THE CLASS PERIOD .........................................................30

    A.      First Quarter 2018 Financial Results ......................................................31

    B.      Second Quarter 2018 Financial Results ..................................................40

**Page**

VI.     THE TRUTH EMERGES ...................................................................................53

VII.    POST-CLASS PERIOD REVELATIONS .........................................................57

VIII.   BY FAILING TO DISCLOSE THE TRUE IMPACT OF THE RAPID
        TRANSITION TO OPEN-END LOANS IN CANADA, DEFENDANTS
        VIOLATED SEC DISCLOSURE RULES..........................................................60

IX.     ADDITIONAL SCIENTER ALLEGATIONS ...................................................64

        A.     Defendants' Admissions Support an Inference of Scienter ...................64

        B.     The Importance of Ontario, Canada to the Company's Operations.......65

        C.     Defendants' Substantial Experience and Monitoring of Test Markets.................67

        D.     The Timing of Defendants' Statements and Magnitude of the Fraud .................70

        E.     Defendants Were Motivated to Maintain a Positive Market Perception of
               the Company .........................................................................................71

X.      LOSS CAUSATION/ECONOMIC LOSS ........................................................72

XI.     APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE
        MARKET DOCTRINE ....................................................................................76

XII.    NO SAFE HARBOR ........................................................................................77

XIII.   CLASS ACTION ALLEGATIONS ..................................................................79

COUNT I: VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE
        10b-5 PROMULGATED THEREUNDER AGAINST CURO AND THE
        INDIVIDUAL DEFENDANTS..........................................................................81

COUNT II: VIOLATION OF SECTION 20(a) OF THE EXCHANGE ACT AGAINST
        THE INDIVIDUAL DEFENDANTS, THE FOUNDER DEFENDANTS, AND
        THE FFL DEFENDANTS..................................................................................82

PRAYER FOR RELIEF .................................................................................................84

JURY TRIAL DEMANDED AND DESIGNATION OF PLACE OF TRIAL ...........................84

By and through its undersigned counsel, Lead Plaintiff Carpenters Pension Fund of Illinois ("Lead Plaintiff" or "Plaintiff") alleges the following against CURO Group Holdings Corp. ("Curo" or the "Company"), Donald F. Gayhardt ("Gayhardt"), William Baker ("Baker"), Roger W. Dean ("Dean"), Doug Rippel ("Rippel"), Chad Faulkner ("Faulkner"), Mike McKnight ("McKnight"), Friedman Fleischer & Lowe Capital Partners II, L.P., FFL Executive Partners II, L.P., and FFL Parallel Fund II, L.P.[1] upon personal knowledge as to those allegations concerning Plaintiff and, as to all other matters, upon the investigation of counsel, which included, without limitation: (a) review and analysis of public filings made by Curo with the Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by certain defendants and other related non-parties; (c) review of news articles, securities analyst reports, and shareholder communications; (d) review of other publicly available information concerning the defendants; (e) investigation of factual sources; and (f) information readily obtainable on the Internet.  Many of the facts supporting the allegations contained herein are known only to defendants named herein or are exclusively within their custody and control.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.     NATURE OF THE ACTION

1.     Plaintiff brings this federal securities class action on behalf of itself and all other similarly situated persons or entities (the "Class") who purchased or otherwise acquired the publicly traded common stock of Curo between April 27, 2018 and October 24, 2018, inclusive

---

[1]   Curo, Gayhardt, Baker, and Dean are referred to herein as "Defendants"; Rippel, Faulkner, and McKnight are referred to herein as the "Founder Defendants"; and Friedman Fleischer & Lowe Capital Partners II, L.P., FFL Executive Partners II, L.P., and FFL Parallel Fund II, L.P. are referred to herein as the "FFL Defendants."

(the "Class Period"), seeking to pursue remedies for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a).

2.    This case concerns Curo's deliberate transition away from its most profitable single line of business in its third-largest geographic region, Ontario, Canada, and the concealed, negative, near-term impact the transition had on the Company's financial results and 2018 financial guidance.

3.    Curo provides lending products to nonprime, underbanked consumers in need of cash in the United States, Canada, and the United Kingdom.[2]  Curo historically operated as a payday lender.  For years, the Company's most profitable single line of business was its Canadian payday (or "single-pay") loans, which generated yields in excess of ***400%*** and had modest, predictable credit losses.  As a result, Curo's Canadian segment, and in particular, the Ontario market (which generated the bulk of the Canadian revenues), was critical to the Company's operations and its ability to meet its financial forecasts.  In fact, revenues from Ontario alone comprised approximately 13% of the Company's total consolidated revenues for the year ended December 31, 2017.

4.    As a payday lender, Curo is heavily regulated by agencies at various levels of government in the jurisdictions in which it operates.  During the years leading up to the Class Period, regulators in Canada began cracking down on the payday lending industry by passing laws regarding borrowing disclosure requirements, caps on the cost of borrowing, and restrictions on certain types of lending practices.  The new regulations were designed to protect consumers from becoming trapped in a never-ending cycle of debt that so many fell victim to at the hands of payday lenders like Curo.  In 2016 and 2017, for example, Alberta, Ontario, and British Columbia passed regulations lowering the amount Curo could charge borrowers for its

---

[2]    In February 2019, Curo exited the United Kingdom.

payday loans, capping the borrowing rate at C$15 in Alberta and Ontario, and C$17 in British Columbia for every C$100 borrowed.

5.     As a result of these regulatory rate changes, the yields on Curo's Canadian single-pay loans steadily declined during 2016 and 2017, dropping from approximately 400% in 2016 down to approximately 250% by the first quarter of 2018 ("1Q18"), which in turn, had a material adverse effect on Curo's Canadian operations.   Given the new payday lending regulations, Defendants knew that the Company's ability to secure a replacement for its highly profitable Canadian single-pay loans was critical to Curo's ongoing financial success and was one of the "key drivers" of the Company's continued growth.   Thus, prior to the Class Period, Defendants developed a strategy to transition Curo's Canadian business out of single-pay loans to installment and line of credit ("open-end") loan products.

6.     Although Curo's open-end loans were lower yield, with yields averaging around 47% to 48%, they were not regulated at the provincial level in Canada and, therefore, were not subject to periodic rate changes.   Curo was also the only payday lender in Canada to offer a line of credit product and, as a result, Defendants viewed Curo's open-end loans as an attractive substitute for its single-pay loans.

7.     As part of their deliberate strategy to transition Canada out of the higher-yield, but heavily regulated, single-pay loans, prior to the Class Period, Curo began converting single-pay customers in Alberta to installment and open-end loans.   Next, Curo opened test stores in the Windsor, Ontario market in order to evaluate the performance and reception of the Company's open-end loan products before introducing them at the Company's 124 branch locations in Ontario.   Defendants closely monitored the results of the Windsor, Ontario test market and had access to real-time detailed customer account data, loan originations, payments, defaults, and payoffs via the Company's proprietary IT platform (the "Curo Platform").

8.     As Curo transitioned customers from smaller balance single-pay loans to higher balance installment and open-end loans, applicable accounting standards required that the Company record an increased provision for loan losses at the time these loans were originated, even though revenues on installment and open-end loans are recognized over a longer period of time than single-pay loans.  In other words, because the Company was required to account for expected loan losses at the time of loan origination, or "upfront," and revenue and yields on those loans take months to build, Curo's open-end loan products were initially less profitable than single-pay loans.  These "up-front provisions" were material to the Company's earnings and, as a result, were an important financial metric that Defendants reported in Curo's SEC filings and routinely discussed, and analysts and investors closely tracked.

9.     Based on the results of the Windsor, Ontario test market and additional, impending payday lending regulations in Ontario, in 1Q18, Defendants quietly made the decision to move up the introduction of open-end loans in the broader Ontario market by an entire year, from 2019 to 2018.  Although the Company was transitioning away from its most profitable single line of business, Defendants nevertheless assured investors that the transition out of single-pay loans in Canada would not be immediate, that revenues from single-pay loans in Canada would be cut in half over the "next few years," and that single-pay loans would remain "viable" during and after the transition.

10.     Defendants also gave investors the false impression that to the extent the Company's operations experienced any negative impact from the transition out of single-pay to installment and open-end loans, the impact would be minimal, confined to the second quarter of 2018 ("2Q18"), and had been "anticipated" and factored into the Company's internal forecast and publicly reported full year 2018 financial guidance ("FY18 guidance").  Thus, when Defendants reaffirmed Curo's FY18 guidance on April 26 and 27, 2018, investors believed that

- 4 -

the Company's guidance was achievable and that the transition to open-end loans in Canada would not materially impact the Company's financial results or its ability to meet guidance.

11.     Unbeknownst to investors, however, beginning in May 2018, Curo significantly ramped up the pace of the transition to open-end loans in Ontario.  Although Defendants could have "moderate[d]" the flow of customers from single-pay to open-end loans (and abated the corresponding up-front provisioning), they made the deliberate decision not to do so, despite knowing or recklessly disregarding the significant operational risk that came with such a rapid transition, which they concealed from investors.

12.     Investors also did not know that during July 2018, Curo substantially completed its transition to open-end loans in Ontario.  As a result of the rapid, unimpeded transition in Ontario, Curo experienced much larger open-end loan balances, materially higher up-front loan loss provisions, and increased marketing spend, which diluted the Company's earnings.  Further, the transition to open-end loans cannibalized Curo's Canadian single-pay revenues, which dropped by *50%* year-over-year in a matter of months rather than over the course of several years.  Yet Defendants continued to conceal from investors the true, negative, near-term impact to Curo's operations and FY18 guidance resulting from the undisclosed, rapid transition to open-end loans.

13.     Instead, on July 30 and 31, 2018, after the "majority" of the losses stemming from the rapid transition to open-end loans in Ontario had already occurred, Defendants doubled-down on their fraud and reaffirmed the Company's FY18 guidance, telling investors there was a "good likelihood" that the Company would come out "ahead" of its published guidance, despite knowing or recklessly disregarding that the FY18 guidance was unachievable.  Rather than reveal Curo's true financial condition, Defendants also continued to give investors the false impression that single-pay loans were still "extraordinarily viable" and that any impact from the

initiation of the Canadian transition had occurred in the just-reported 2Q18, but would not negatively impact the Company's overall financial results for the second half of the year.

14.     By failing to disclose the true, negative, near-term financial impact stemming from Curo's rapid transition to open-end loans in Canada, and particularly in Ontario, the Company's Class Period Forms 10-Q also violated SEC disclosure rules, including Item 303 of SEC Regulation S-K, which required Curo to disclose "any known trends or uncertainties that have had," or that Curo "reasonably expects will have, a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."

15.     Defendants' misstatements and omissions had their intended effect, as the price of Curo stock was artificially inflated during the Class Period, reaching as high as $31.33 on September 25, 2018.   Taking advantage of the Company's favorable, but misrepresented, financial position, in August 2018, Curo sold $690 million in senior secured notes in a debt offering that would not have been on such favorable terms had the truth been known.   On and around the time Curo stock reached its Class Period high, Baker sold over 56,000 shares of Curo stock for proceeds of almost $1.8 million.   Just a month later, Defendants would reveal the truth about the materially negative, short-term impact to Curo's operations, financial results, and FY18 guidance caused by the Company's rapid transition to open-end loans in Canada, and specifically Ontario.

16.     After the market closed on October 24, 2018, Curo announced dismal third quarter 2018 ("3Q18") financial results, reporting adjusted diluted Earnings Per Share ("EPS") of only $0.23, widely missing analysts' consensus EPS by over 50%.   Defendants revealed that "[b]y far the biggest impact to quarterly results," including an 8.8% year-over-year decline in Canadian revenue, "was the ongoing product migration in Canada, specifically in the province of Ontario."   Additionally, despite Defendants' representations just months earlier that they had a

"very high degree of confidence" in achieving or even surpassing the Company's FY18 guidance, Curo significantly cut its FY18 guidance for adjusted EPS, net income, and adjusted earnings before interest, tax, depreciation, and amortization ("EBITDA").

17.     During the Company's 3Q18 earnings conference call, Gayhardt issued a mea culpa, "acknowledg[ing] that this quarter fell short of our expectations, and probably your expectations, and quite simply, is not up to our standards" and all but admitted that Defendants knew the Company's FY18 guidance was unachievable at the time they reaffirmed it on April 27 and July 31, 2018, stating, "we did a less than stellar job of explaining in our – probably our July call or even back into our April call . . . the impact of [the Canadian transition] . . . in the near term . . . we probably didn't lay it out for everybody as explicitly as we probably should have. And we'll try not to make that mistake again."  Dean also confirmed that the "majority" of the loss for 3Q18 "came in July," prior to Defendants' false statements and omissions on July 30-31, 2018.  In response to this news, the price of Curo common stock tumbled almost *34%*.

18.     After the Class Period, Defendants admitted that: the decision to move up the introduction of open-end loans in Ontario from 2019 to 2018 was made during 1Q18; they intentionally chose not to moderate the transition to open-end loans in Ontario, despite the known operational risks; the transition to open-end loans in Canada "came at the expense of single-pay loan balances," which declined *50%* in 3Q18 year-over-year; the rapid transition was "dilutive to Canadian earnings in the near term"; Canadian adjusted EBITDA dropped *more than 50%* year-over-year as a result of the transition; and the Company had converted almost *40,000* customers to open-end loans in 3Q18, but expected to convert only 4,000 to 5,000 customers a month going forward.

19.     Contradicting certifications on Curo's quarterly reports filed with the SEC during the Class Period, Defendants also disclosed that the Company's "disclosure controls and

procedures were not effective" and did not provide reasonable assurance "to ensure that information required to be disclosed in reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC rules and forms."  Then, on May 6, 2019, Curo revealed in its Form 10-Q for the quarter ended March 31, 2019 ("1Q19 10-Q") that it had "received an inquiry from the SEC regarding the Company's public disclosures surrounding its efforts to transition the Canadian inventory of products from Single-Pay loans to Open-End loans."

## II.     JURISDICTION AND VENUE

20.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

21.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331.

22.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)-(c) and Section 27 of the Exchange Act.  Curo's principal executive offices are located in this District, many of the acts and practices complained of herein occurred in substantial part in this District, and Defendants disseminated materially false and misleading statements complained of herein to Curo shareholders from this District.

23.     In connection with the challenged conduct, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, without limitation, the U.S. mails, interstate telephone communications, and the facilities of the national securities markets.

### III.  PARTIES

#### A.  Lead Plaintiff

24.     Lead Plaintiff Carpenters Pension Fund of Illinois, as set forth in the certification on file (ECF No. 20-3), incorporated by reference herein, purchased Curo shares at artificially inflated prices during the Class Period and was damaged when the truth was revealed, as detailed herein.  *See also* ECF No. 20-4.

#### B.  Defendants

##### 1.  Corporate Defendant

25.     Defendant CURO Group Holdings Corp. is a Delaware corporation with its headquarters located at 3527 North Ridge Road, Wichita, Kansas  67205.  On December 7, 2017, Curo's common stock began trading on the New York Stock Exchange ("NYSE"), an efficient market, under the ticker symbol "CURO."  On December 11, 2017, the Company completed its initial public offering ("IPO"), which generated net proceeds of $81.1 million.

##### 2.  Individual Defendants

26.     Defendant Donald F. Gayhardt has served as the Company's Chief Executive Officer ("CEO") since January 2012, as the Company's President since July 2013, and as a director since December 2012.  According to Curo, Gayhardt has over "25 years of executive management experience in the short-term credit industry with a history of completing large acquisitions and complex financial transactions."   Prior to joining the Company, Gayhardt worked in various capacities at Dollar Financial Corp. (now known as DFC Global Corp. ("DFCGC")), from 1990 to 2008, including as DFCGC's President from 1998 to 2008.  Like Curo, DFCGC's business centers on providing financial services to unbanked and underbanked consumers.  Gayhardt earned his Bachelor of Business Administration degree in Accounting from the University of Notre Dame.

27.     Defendant William Baker has served as the Company's Chief Operating Officer ("COO") since February 2016.  Prior to that, Baker was Curo's Chief Marketing Officer from September 2011 until 2016 and Vice President of Marketing and Business Development from April 2007 until September 2011.  Curo credits Baker as leading "the launch of the Company's digital business and the development of the risk and analytics function."   Baker earned a Bachelor of Science Degree in Integrated Marketing Communications from Gannon University.

28.     Defendant Roger W. Dean has served as the Company's Executive Vice President and Chief Financial Officer ("CFO") since May 2016.  According to the Company, Dean has "[o]ver 30 years' experience, including 9 years with Deloitte and over 20 years in banking, financial services and capital markets."   From 2005 to 2016, Dean was the CFO for CNG Holdings, Inc., a financial services company focused on providing short-term money needs to consumers.  Prior to that, Dean was the Senior Vice President-Controller with Fifth Third Bancorp and a Senior Manager with Deloitte.   Dean earned his Bachelor of Science in Accountancy from Miami University, Oxford, Ohio.

29.     Defendants Gayhardt, Baker, and Dean are referred to herein as the "Individual Defendants."

30.     During the Class Period, the Individual Defendants, as senior executive officers and/or directors of Curo, were privy to confidential and proprietary information concerning Curo's financials and the Company's transition from single-pay to installment and open-end loans in Canada.  Because of their positions with Curo, the Individual Defendants had access to non-public information about the Company's business and growth prospects through access to internal corporate documents, the Curo Platform, conversations and connections with other corporate officers and employees, attendance at management and/or Board of Directors meetings and committees thereof, and reports and other information provided to them in connection

therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

31.     The Individual Defendants are liable as direct participants in the wrongs complained of herein. In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act, and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. Because of their positions of control, the Individual Defendants were able to, and did, directly or indirectly, control the conduct of Curo's business.

32.     The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Curo's quarterly reports, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, and, through them, to the investing public. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with the Company, and their access to material, non-public information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants had the opportunity to commit the fraudulent acts alleged herein and are liable for the false and misleading statements pleaded herein.

33.     As senior executive officers and/or directors and as controlling persons of a publicly traded company whose stock was registered with the SEC, traded on the NYSE, and governed by the federal securities laws, the Individual Defendants had a duty to promptly

disseminate accurate and truthful information with respect to Curo's business, including the negative financial impact that would result from the Company's rapid transition from single-pay to installment and open-end products in Canada, and Curo's future business prospects, and to correct any previously issued statements that had become materially misleading or untrue so that the market price of Curo stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

### 3.    Founder Defendants

34.    Defendant Doug Rippel was one of Curo's co-founders and has served as its Executive Chairman of the Board of Directors since 2012. Before that, he was Chairman of the Board of Directors from 2008 to 2012, CEO from 1997 to January 2012, and Secretary and Treasurer from 1997 to 2008. Curo states that as one of the Company's founders, Rippel "has led the Company in its entire geographic and product expansion."

35.    Defendant Chad Faulkner was one of Curo's co-founders and has served on Curo's Board of Directors since 1997. Faulkner also served as the Company's President and COO from 1997 to 2013. Curo states that as one of the Company's founders, Faulkner "has led the Company in its entire geographic and product expansion." In connection with Curo's May 17, 2018 offering of 5,000,000 shares of Curo common stock held by controlling insiders and members of the Board of Directors (the "Selling Stockholders Offering"), Faulkner sold 500,0002 shares of Curo stock, generating more than $10.9 million in proceeds.

36.    Defendant Mike McKnight was one of Curo's co-founders and has served on its Board of Directors since 1997. From 1997 to 2008, McKnight also served as Vice President of the Company. According to the Company, McKnight has been involved in the Company's strategic direction and governmental affairs. McKnight initially managed loan office operations,

and then later directed the real estate, construction, media, and marketing arms of the Company, "utilizing his prior career as a radio advertising executive to build a successful advertising campaign."   In connection with the Selling Stockholders Offering, McKnight sold 500,000 shares of Curo stock, generating more than $10.9 million in proceeds.

### 4.   FFL Defendants

37.   Friedman Fleischer & Lowe Capital Partners II, L.P., FFL Executive Partners II, L.P., and FFL Parallel Fund II, L.P., sometimes collectively referred to by Curo as FFL Partners, made a significant investment in the Company in 2008 and, according to Curo, "ha[ve] contributed significant resources to helping define our growth strategy."   In connection with the Selling Stockholders Offering, the FFL Defendants sold 3,497,411 shares at a net price of $21.85 (after underwriting discounts and commissions) for proceeds of more than $76 million, reducing their holdings of Curo stock from 13,212,000 shares to 9,714,589 shares and decreasing their percentage of total common stock and voting power from 29% to 21.23%

38.   According to Curo, the Founder Defendants and the FFL Defendants controlled Curo, collectively had the ability to elect all of the members of Curo's Board of Directors and "thereby control[led] [Curo's] policies and operations, including the appointment of management."   The FFL Defendants and the Founder Defendants were also majority shareholders of Curo as they beneficially owned approximately 28.67% and 44.81% of Curo's common stock, respectively, as of December 31, 2017, or approximately 28.06% and 43.86%, respectively, after the underwriters exercised in full on January 5, 2018 their option to purchase additional shares in connection with the Company's IPO.   Accordingly, the Founder Defendants and the FFL Defendants exerted control over both Curo and the Individual Defendants prior to and during the Class Period.

39.     The Founder Defendants and the FFL Defendants, by reason of their status as majority shareholders and/or directors, with "control" over the Company's "policies and operations" were "controlling persons" within the meaning of Section 20(a) of the Exchange Act, and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein.   Because of their positions of control, the Founder Defendants and the FFL Defendants were able to, and did, directly or indirectly, control the conduct of Curo's business.

## IV.     SUBSTANTIVE ALLEGATIONS

### A.     Background on Curo

40.     Founded in Riverside, California in 1997, Curo describes itself as "a growth-oriented, technology-enabled, highly diversified consumer finance company serving a wide range of underbanked consumers."   Curo provides lending products to nonprime, underbanked consumers in need of cash, targeting consumers with a FICO score of 660 or less.   These individuals often have been rejected by traditional banking services and are looking for other nonbank options, need cash in between paychecks, or need access to financial services outside of normal banking hours.

41.     Over the years, through acquisitions and organic growth, including the launch of new brands, the Company has expanded across the U.S., Canada, and the U.K.   In Canada, Curo's stores are branded "Cash Money" and the Company offers "LendDirect" installment loans online and at certain stores.   As of December 31, 2017, Curo operated 193 stores in seven Canadian provinces and had an online presence in five provinces.

42.     During the Class Period, Curo's Canadian operations accounted for a material amount of the Company's profitability.   For example, during 2017, the Canadian segment generated 19% of Curo's revenues and accounted for approximately 19.5% and 55% of Curo's

gross margin and pre-tax income, respectively.   During 2018, the Company's Canadian operations accounted for approximately 12% of Curo's gross margin and generated pre-tax income of approximately $17 million, while its U.S. operations generated pre-tax income of only $1.1 million, and its U.K. operations generated a pre-tax loss of $38.7 million.   Curo's Ontario market was particularly important to the Company's operations.   In 2017, almost 13% of the Company's total consolidated revenues came from Ontario and it was the Company's third largest geographic region behind California and Texas.

43.   Defendants routinely tout, and the Company relies heavily on, its proprietary IT platform, called the "Curo Platform," for every aspect of the Company's underwriting and scoring of its loan products.   Among other information, the Curo Platform captures transactional history by store and customer, which allows the Company to track loan originations, payments, defaults, and payoffs, as well as historical collection activities on past-due accounts.   According to the Company, the Curo Platform allows it to make real-time, data-driven changes to its acquisition and risk models.   The Company also uses the Curo Platform to decide whether to extend credit to prospective customers and the terms on which to provide credit, including the price.

44.   During the Class Period, Curo offered single-pay loans, installment, and open-end lines of credit, and a number of ancillary financial products including check cashing, gold buying, and credit protection insurance.   Most relevant here are the Company's single-pay and open-end loans.

45.   Single-pay loans, commonly referred to as payday loans, are generally high yield, but short-term, small denomination loans that provide a customer with immediate cash in exchange for a post-dated personal check or a pre-authorized debit from the customer's bank account.   Curo charges customers a fee based on the amount of money borrowed and, in

exchange, it defers deposit of the check or debit from the customer's account until the loan due date, which typically falls on the customer's next pay date.

46.      Open-end loans are a lower yield line of credit without a specified maturity date. Customers are free to borrow against their line of credit, and repay with minimum, partial, or full payment and redraw as needed.  Curo earns interest on the outstanding loan balances drawn by the customer against their approved credit limit.

47.      Sizeable credit losses are an inherent part of Curo's business.  As a result, the Company is required to create an accounting reserve, or "allowance for loan losses," for those probable credit losses.  To establish and maintain its allowance for loan losses, Curo takes a "provision," which is a periodic charge against its earnings.  Calculating the provision for losses requires Curo to consider a variety of quantitative and qualitative factors regarding the loans originated by Curo.  With installment and open-end loans, Curo is required to reserve for expected losses through a provision at the time of origination, even though revenues from those loans cannot be recognized until payments on the loan balances are collected from customers over time.  Thus, as Curo transitioned from small, short term single-pay loans to larger, longer-term open-end loans, Curo had to take larger "up-front" provisions against expected credit losses.

48.      Because Curo's open-end loans traditionally had higher loan balances as compared to the Company's single-pay loans, the up-front provisions Curo was required to take on its open-end loans were also materially higher.  Specifically, the average single-pay loan was approximately $600, while the average open-end loan was approximately $2,400, with the average amount drawn of approximately $1,800, or *three times* the size of the average payday loan.

### B.  Tightening Payday Lending Regulations in Canada Threaten Curo's Most Profitable Line of Business, Canadian Payday Loans

49.     Curo's Canadian single-pay loans were historically the Company's most profitable single line of business, generating yields as high as ***400%*** in the years before the Class Period with modest, predictable credit losses.  For the year ended December 31, 2017, single-pay loans comprised 27.9% of the Company's total revenues, almost half of which (15%) were derived from Canada.  In the years and months leading up to the Class Period, however, tightening payday lending regulations in Canada threatened the profitability of Curo's single-pay loans.

50.     Payday loans can be extremely expensive, with annual interest rates ranging from 200% to more than 500%, depending on the state or province in which the loan is made.  For example, a payday loan customer who borrows $500 typically owes about $575 two weeks later, which translates into an annual percentage rate of nearly 400%.  If borrowers cannot repay their loans on time, they often borrow more and deepen their debt, becoming trapped in a cycle of ultra-high interest debt that is difficult to break.  This cycle of adding on new debt to pay back the original debt can turn a single, unaffordable loan into a long-term debt trap.  A 2018 report from Canada, for example, revealed that almost four out of ten insolvencies in Ontario involved payday loans, with the average insolvent payday loan borrower owing C$5,174 on an average of 3.9 different loans.

51.     Given the predatory and deceptive nature of some payday loans, the payday lending industry is heavily regulated.  In Canada, payday loans are regulated by each province. The provincial payday lending regulations generally relate to cost of borrowing and related caps, disclosure requirements, collection activity requirements, and restrictions on certain types of lending practices.  In Ontario, for example, the Payday Loans Act of 2008 was specifically created to regulate payday lenders like Curo.  Leading up to the Class Period, a number of

- 17 -

Canadian provinces began cracking down on payday lenders by passing new legislation that further restricted their lending practices in order to protect Canadians from becoming trapped in never-ending debt cycles.

52.     In May 2016, the Alberta government introduced Bill 15, "An Act to End Predatory Lending," which lowered the borrowing rate for single-pay loans from C$23 to C$15 for every C$100 borrowed, making it the lowest rate in Canada.  The proposed legislation also included provisions requiring lenders to allow borrowers to repay payday loans in installments, rather than all at once, and prohibiting lenders from directly soliciting potential customers, charging a fee to cash a check for a payday loan, and offering a loan when another is outstanding, among other changes.  The C$15 rate cap became effective in August 2016 and final regulations for the installment payments became effective in November 2016.

53.     In November 2016, the Ontario Ministry of Government and Consumer Services (the "Ontario Ministry") passed new legislation reducing the total cost of borrowing on single-pay loans from C$21 to C$18 for every C$100 borrowed, with the new law becoming effective January 1, 2017.

54.     Similarly, and also effective January 1, 2017, the British Columbia Ministry of Public Safety and Solicitor General ("British Columbia Ministry") reduced the total cost of borrowing from C$23 to C$17 for every C$100 borrowed.  When the British Columbia Ministry announced this regulatory change, it also stated that it was considering whether, and to what extent, additional regulations may be warranted.

55.     In December 2017, the Ontario Ministry tightened regulations again, capping the cost to borrowers of single-pay loans at C$15 for every C$100 borrowed, with the new regulation becoming effective on January 1, 2018.  The Ontario Ministry also announced further amendments effective July 1, 2018, that required: (i) a mandatory extended payment plan for

borrowers with three or more loans with the same lender within a 63-day period; (ii) a requirement that the loan amount cannot exceed 50% of the customer's net pay in the month prior to the loan; and (iii) mandatory disclosures in advertisements and loan agreements about the cost of borrowing a payday loan.

56.     Because regulations in Canada had the potential to materially impact Curo's financial results and operations, Defendants closely monitored and routinely discussed the Canadian regulatory environment and any proposed or final regulations.  Indeed, Defendants discussed the Canadian regulatory environment in Curo's SEC filings and spoke about the topic on every quarterly earnings conference call since becoming a publicly traded Company, providing updates on existing or proposed legislation and answering questions from analysts about the impact of new regulations.  Accordingly, Defendants were aware of and "anticipated" the impending regulatory changes in Ontario well before they went into effect, along with the negative impact those regulations would have on the Company's operations and financial results.

57.     As a result of new regulations in Alberta, British Columbia, and Ontario that lowered the borrowing rates on payday loans, Curo began experiencing steadily declining yields on its single-pay loans.  In 2016, for example, the yields on single-pay loans in Canada were nearly 400%, but by 1Q18, the yields had declined substantially and were hovering around 250%.

58.     To sustain the market's perception that Curo was a rapidly growing company, Defendants knew that the Company needed to transition out of single-pay loans in Canada, which were quickly becoming less profitable for the Company, into other product offerings like installment and open-end loans.  In fact, one of Curo's stated "key drivers" of its continued growth was the Company's ability to successfully continue the "mix shift" in its products from single-pay to installment and open-end loans.

59.     Further, given the importance of the Ontario market to Curo's operations, the Company's ability to replace revenues derived from single-pay loans with revenues from other product offerings was especially critical.  And, because open-end products have lower average yields, the Company needed to significantly increase the volume of open-end loans to offset the decline in single-pay revenues and yields.  For example, open-end loans average a yield of only around 47% to 48% annually due to federal regulations in Canada that put a cap on the annual percentage rate of such loans.

### C.     Curo Starts to Transition Customers in Canada from Single-Pay to Installment and Open-End Loans

60.     As a result of the regulatory changes in Canada, Defendants implemented a strategy to replace single-pay loans in Canada.  Prior to the Class Period, Curo started to transition customers in Alberta and Ontario – which together accounted for 80% of the Company's Canadian revenues – away from single-pay loans and into installment and open-end loans.

61.     Curo began the transition in Alberta where it converted existing single-pay customers into installment and then open-end loans and also acquired new open-end customers. According to Defendants, the Company experienced "really good" demand in Alberta and said that "converting existing customers [was] going excellent."  By rolling out open-end loans in Alberta first, the Company was able to collect detailed customer data via the Curo Platform, which helped inform Defendants' expectations for the broader Canadian open-end product transition.

62.     In its fourth quarter 2017 ("4Q17"), Curo began opening small format LendDirect loan offices in Ontario, which focused on unsecured installment and open-end loans, rather than payday loans.  In February 2018, Curo began testing open-end loans in the Windsor, Ontario market and, during the initial test phase, converted nearly 3,000 single-pay loans to open-end

loans.  The Company also continued expanding its LendDirect stores, opening two more stores in Canada during 1Q18.  According to Defendants, the Company was "very pleased" with the foot traffic, take-up rate, and first-pay default rates on the LendDirect open-end loan product.

63.     Based on the positive results in the test markets, and the recent regulatory changes, during 1Q18, Defendants made the strategic decision to move up the transition to open-end loans in the broader Ontario market by an entire year – from 2019 to 2018.  Although the Company was transitioning away from its most profitable single line of business into the lower-yield open-end loans, Defendants reassured investors during Curo's 1Q18 earnings conference call on April 27, 2018 that despite the recent rate changes in Ontario, which the Company had "anticipated," single-pay lending would remain "viable in Ontario."  Notably, Gayhardt made clear to investors that the Company's transition out of single-pay loans in Canada would not be immediate or rapid, but would occur over the "next couple of years."

64.     During the Company's 1Q18 earnings conference call, Gayhardt also explained that the up-front provisioning resulting from the Canadian transition would have a negligible impact on the Company's operations, stating that as the Company continued to grow its open-end business, "the revenue and profitability from [installment and open-end] products [would] lag *a little bit* just because of the way you have to provision upfront."[3]  Dean similarly told investors that as a result of "open-end and installment growth in Canada," the Company's 2Q18 results could be "depressed," but that any pressure would be relieved by 3Q18, when Curo would start "to come out of that provision on loan growth pressure."  Defendants further assured investors that the Company had "anticipated" any increased upfront provisioning from the Canadian transition "when we developed our forecast and our guidance" and that there was

---

[3]     All emphasis is added unless noted otherwise.

nothing "going on in terms of mix shift or the overall kind of growth trends" that was out of line with the Company's forecast.

65.     Defendants' statements led investors to believe that the Company's transition out of single-pay loans in Canada, and Ontario specifically, would not impact the Company's overall financial results and ability to maintain and meet FY18 guidance.  In fact, during the April 27, 2018 earnings conference call, Defendants were "very happy to affirm" the Company's FY18 guidance, which included net income in the range of $110 million to $116 million, adjusted EBITDA in the range of $245 million to $255 million, and EPS of $2.25 to $2.40.

66.     The market believed Defendants' statements.  In an analyst report dated April 30, 2018, for example, Jefferies Financial Group ("Jefferies") stated that "following the strong 1Q we have a high degree of confidence in the company's ability to achieve its strong guidance factors."

67.     On May 14, 2018, Curo filed a Registration Statement on Form S-1 with the SEC for the Selling Stockholders Offering.  On May 16, 2018, the SEC declared the registration statement effective, and on May 17, 2018, Curo conducted the Selling Stockholders Offering, which generated $109,250,000 in proceeds for the selling stockholders, which included the FFL Defendants, Faulkner, and McKnight.

> **D.     Curo Rapidly Completes the Transition to Open-End Loans in Ontario, but Conceals the Negative Financial Impact from the Transition and Reaffirms Guidance for 2018**

68.     Seeking to capitalize on the favorable results in the Ontario test markets and a time of seasonally high demand in Canada, unbeknownst to investors, beginning in May 2018, Curo significantly ramped up the transition to open-end loans in Ontario.  The Company sought to convert existing single-pay customers into open-end loan products at the Company's remaining 107 branches in Ontario and also targeted new customers.  Rather than moderate the

transition away from single-pay loans over the "next couple of years," Curo opened the spigot, rapidly completing the majority of the transition just months later, by July 2018, and causing an undisclosed, materially negative, short-term impact to Curo's 3Q18 operations and financial results, and the Company's ability to meet its FY18 guidance.

69.     As part of Defendants' strategy to rapidly complete the transition to open-end loans in Ontario, Curo launched a full-court press marketing campaign, targeting existing single-pay and potential customers via direct mailing, cable TV, and other mediums.  As Gayhardt later described the Company's marketing strategy: "if you live in Ontario . . . unless you're kind of living in a cave, we think we've reached you multiple times with this advertising."

70.     The Company's marketing campaign was a success, as investors would later learn that Curo converted nearly 40,000 customers to open-end loans by the end of 3Q18.  Curo's customers borrowed meaningfully more money via the open-end loan product, which had an average open-end loan balance that was approximately three times the size of the average payday loan.  And because Curo primarily targeted existing single-pay customers, the Curo Platform gave Defendants detailed data about those customers, including information about originations, payments, defaults, and payoffs.  Defendants therefore knew or recklessly disregarded that open-end customers were taking out larger loans, resulting in larger loan balances and higher up-front provisions, which had a material, negative impact on Curo's operations and financial results.

71.     Although Defendants could have moderated the flow of customers from single-pay to open-end loans, thereby abating the increase in loan loss provisions and the decrease in single-pay revenue, as Defendants would later admit, they made the deliberate choice not to do so even though they knew or recklessly disregarded but concealed from investors, that the rapid transition to open-end loans in Ontario came with significant operational risks (risks that later materialized).

- 23 -

72.     Instead of disclosing that Curo's transition to open-end loans had been substantially completed by July 2018 or the resulting negative impact to Curo's operations and FY18 guidance, Defendants continued to misrepresent and conceal the true facts about the Company's Canadian transition.  Indeed, when announcing the Company's 2Q18 earnings results on July 30, 2018, *after* Curo had substantially completed the transition to open-end loans and *after* the "majority" of the losses stemming from the transition had already occurred, Defendants continued to tout their "confidence" in the Company's FY18 guidance and downplayed any impact to the Company's financial results or guidance as a result of the transition.

73.     As an example, during the Company's 2Q18 earnings conference call on July 31, 2018, Defendants provided an update on the "*early* stage of a very successful introduction transition of a big part of our Ontario lending business of the legacy single-pay loan product to a[n] [open-end] line of credit that's been very well received by our customers."  During the July 31, 2018 call, Defendants also disclosed for the first time that the Company had moved up the transition to open-end loans in Ontario from 2019 to 2018, but did not disclose the truth: that the "majority" of the transition and the associated losses had already occurred.

74.     Defendants also gave investors the false impression that any negative impact resulting from the transition had occurred in the just-reported 2Q18, but would normalize in the second half of the year.  Specifically, during the July 31, 2018 earnings conference call, Defendants explained that the transition in Ontario could result in "lower revenue while the book builds and higher provision when larger balance dollars are originated," but gave investors the false impression that the "higher provision" from the Company's transition had occurred in 2Q18, reporting "diluted earnings for [2Q18]" and explaining that Curo could have had "better earnings [in 2Q18] had we taken a more incremental approach."  Indeed, Defendants assured

investors that the "growth rate for provision expense should match up better with revenue growth rates for the next couple quarters," that "our provision in the second half of the year would run about with revenue," and that "the provisioning should be in line with revenue."

75.   Further, although the Company cautioned that the transition could "impact earnings for the full year versus our plan" and that the ongoing Canadian transition was "too fluid" to completely discount a bit of downside risk, the Company nevertheless affirmed its previously announced FY18 guidance.  In fact, Gayhardt told investors he had a "very high degree of confidence in achieving" full year guidance and that there was "a good likelihood that we'll come out ahead on our internal forecasts and our published guidance."

76.   Analysts and investors believed Defendants' representations.  For example, in an analyst report dated July 30, 2018, Stephens, Inc. ("Stephens") observed that, "2Q18 results were strong, and imply to us the need to raise our EPS estimates . . . .  Since provisions are one-time and revenues are ongoing, that would imply upside to our future EPS estimates."

77.   Investors did not know that, at the time of Defendants' statements on July 30 and 31, 2018, the Company had already completed the majority of the transition to open-end loans in Ontario, which had a material, negative impact on the Company's operations, "dramatically" reduced Canadian single-pay revenues, and meant that the Company would not be able to maintain or meet the FY18 guidance Defendants told investors they had a "very high degree of confidence in achieving."

78.   Defendants knew or recklessly disregarded but concealed from investors, that the Company's rapid transition to open-end loans in Ontario had resulted in more loans with larger loan balances and, in turn, higher up-front provisioning.  Defendants also knew or recklessly disregarded that the Company's advertising costs had skyrocketed as the Company spent more money marketing its open-end loan products to existing and new customers.  Further, the

Company's transition to open-end loans had cannibalized single-pay revenue and, rather than occurring over the course of a few years, the transition was substantially complete by the time of Defendants' statements on July 30 and July 31, 2018, causing an undisclosed, negative short-term impact to the Company's operations and financial results, and rendering Curo's FY18 guidance unachievable.

### E.   Curo Completes a $690 Million Senior Secured Notes Offering and Baker Sells Over $1 Million in Curo Stock

79.   On August 6, 2018, Curo announced that it intended to offer $675 million aggregate principal amount of its senior secured notes due 2025 in a private placement (the "Offering").  On August 13, 2018, Curo announced that it had upsized the Offering from $675 million to $690 million aggregate principal amount and disclosed that the senior secured notes, due 2025, would be priced at 8.25%.  The Company also disclosed that it intended to use the net proceeds from the sale: (i) to redeem the outstanding 12% senior secured notes due 2022 of the Company's wholly owned subsidiary; (ii) to repay the outstanding indebtedness under the Company's wholly owned subsidiary, five-year revolving credit facility; (iii) for general corporate purposes; and (iv) to pay fees, expenses, premiums, and accrued interest in connection therewith.

80.   A little over a month later, beginning on September 25, 2018, Baker began selling 100% of his vested shares of Curo stock.  Over the course of two days, Baker sold 56,844 shares of Curo stock for proceeds of ***$1,792,351.00***.  Just a month after Baker's Class Period stock sales, Curo would report disappointing 3Q18 results and substantially lower its FY18 guidance as a result of the transition to open-end loans in Canada and Ontario specifically.

F.     **Curo Reports EPS Below Analysts' Consensus and Reduces FY18 Guidance as a Result of the Transition to Open-End Loans in Canada**

81.     After the market closed on October 24, 2018, Curo reported its financial results for 3Q18.  The Company reported revenue of $283 million, adjusted diluted EPS of *only $0.23*, and a year-over-year earnings decline "primarily due to required up-front provisioning."  In the Company's press release, Gayhardt revealed that the Company's results were "particularly affected by the acceleration of Open-End loan product in Canada" and "[t]he related upfront loan loss provisioning," which caused Canadian "net revenue and Adjusted EBITDA to drop by $10.9 million and $13.2 million sequentially."  Canadian revenue also declined 8.8% year-over-year "primarily due to the continued product mix shift from Single-Pay," which was affected "primarily by regulatory changes in Canada (rate changes in Alberta, Ontario and British Columbia) leading to a shift to Open-End loans as well as a continued general product shift from Single-Pay to Installment and Open-End loans in all countries."

82.     Despite Defendants' representations just three months earlier that they had "a very high degree of confidence" in achieving, and even surpassing, FY18 guidance, the Company significantly cut its adjusted EPS guidance for 2018 to $1.84 to $1.88, down from $2.25 to $2.40, lowered adjusted net income guidance to $88 million to $91 million, down from $110 million to $116 million, and cut adjusted EBITDA guidance to $215 million to $218 million, down from $245 million to $255 million.

83.     Before the market opened on October 25, 2018, Curo hosted an earnings conference call to discuss its 3Q18 results.  Gayhardt opened the conference call by "acknowledg[ing] that this quarter fell short of our expectations, and probably your expectations, and quite simply, is not up to our standards."  He disclosed that nearly the entirety of the operating earnings shortfall related to the Company's "ongoing Canadian product migration and increased loan loss provision related to higher-than-expected loan growth," confirmed that "[b]y

- 27 -

far the biggest impact to quarterly results was the ongoing product migration in Canada, specifically in the province of Ontario," and revealed that the Company was "dramatically reducing [its] Canadian Single-Pay revenue."  Gayhardt also confirmed that "we **completed** the transition to [open-end] in Ontario and Alberta."  In contrast to Defendants' prior representations that the loss provision in the second half of the year would run "about even" with revenue, the Company reported "loan loss as a percentage of revenue at 52.9%."  Gayhardt reiterated that a "significant part" of the reduction in 2018 EPS guidance "relates to the allowance builds for line of credit product," *i.e.*, the up-front provisioning required for open-end loans.

84.     Dean provided additional details on the Company's 3Q18 results, disclosing that adjusted EBITDA for the quarter was **down 25.4%** year-over-year driven by "elevated loan growth, related loan loss provisioning and higher ad spend" in connection with the Company's transition to open-end loans in Canada.  The Canadian business missed expectations by more than $12 million "on loan portfolio mix shift and upfront provisioning on acceleration of Open-End in Ontario."

85.     Then, Defendants all but admitted that they knew the Company's FY18 guidance was unachievable at the time they reaffirmed it on April 27 and July 31, 2018 as a result of the transition from single-pay to open-end loans in Canada and specifically Ontario.  Gayhardt conceded that "we did a less than stellar job of explaining in our – probably our July call or even back into our April call . . . the impact of this . . . in the near term . . . we probably didn't lay it out for everybody as explicitly as we probably should have.  And we'll try not to make that mistake again."  Dean also confirmed that the "majority" of the loss for 3Q18 "came in July."

86.     In response to Defendants' revelations, the price of Curo stock tumbled **34%**, or $7.69, falling from $22.87 per share on October 24, 2018 to a close of $15.18 on October 25, 2018, with significantly elevated trading volume of nearly 3 million shares traded.

87.     Analysts were also stunned by the Company's disclosures and reacted negatively to the Company's 3Q18 financial results, particularly its reported EPS of only $0.23, which missed analysts' consensus EPS of $0.52 by *over 50%*.  In a report dated October 25, 2018, for example, Credit Suisse commented that "the quarter was marred by upfront provisioning due to growth in lower-yield market (i.e. Canada)" and decreased its price target for the Company as a result of its 3Q18 financial results and revised FY18 guidance.  In a report dated October 26, 2018, Stephens observed that "[t]he miss and the resulting pain to Curo shares appears to be self-inflicted, driven by 1) over aggressive growth in the Canadian line of credit product, and 2) a lack of visibility into the scenarios of the guide down, either at the 2Q18 call or during the debt raise."  Stephens also lowered its price target from $38.00 down to $22.00.

### G.     Post-Class Period Revelations

88.     On November 8, 2018, Gayhardt, Dean, and Baker presented at the Stephens Fall Investment Conference ("Stephens Conference"), during which they provided additional details about Curo's transition to open-end loans in Ontario.  Gayhardt confirmed that Defendants made the decision to move up the transition to open-end loans in Ontario from 2019 to 2018 in 1Q18 and that they intentionally chose not to moderate the speed of the transition even though they could have done so.  Gayhardt also confirmed that the bulk of the Ontario transition occurred in "May . . . June in honest," *i.e.*, before Defendants' statements on July 30 and 31, 2018.

89.     On January 31, 2019, Curo reported its financial results for the fourth quarter 2018 ("4Q18") and the year-ended December 31, 2018, disclosing that revenue from single-pay loans in Canada comprised only 7% of the Company's total revenue for 4Q18, compared to 14.6% for the same time period in 2017.  For the year, single-pay loans had dropped to 10% of the Company's total revenue in 2018, down from 15% the prior year.

90.     On March 18, 2019, Curo filed its Form 10-K for the fiscal year ended December 31, 2018 ("2018 10-K").  Defendants admitted that the accelerated shift to open-end loans in Canada "came at the expense of single-pay loan balances."  In the 2018 10-K, Defendants also disclosed, for the first time, that Curo's "disclosure controls and procedures were not effective" as of December 31, 2018.

91.     Then, on May 6, 2019, Curo filed its 1Q19 10-Q.  In it, the Company disclosed that it had "received an inquiry from the SEC regarding the Company's public disclosures surrounding its efforts to transition the Canadian inventory of products from Single-Pay loans to Open-End loans."

92.     As of the date of this Complaint, the price of Curo stock has not recovered from its significant decline.  In fact, it has declined even more, and closed at approximately $10.00 per share as of May 30, 2019.

## V.    MATERIALLY FALSE OR MISLEADING STATEMENTS AND OMISSIONS ISSUED DURING THE CLASS PERIOD

93.     Throughout the Class Period, Defendants misrepresented and concealed the true extent of the negative short-term impact that the Company's rapid transition from single-pay to installment and open-end loans in Canada, particularly in Ontario, where Curo generated the vast majority of its Canadian revenue, would have on the Company's operations, financial results and FY18 guidance. Defendants' statements gave investors the false impression that the transition would occur smoothly over a number of years; that any negative impact from the initiation of the transition would dissipate by 3Q18; that the transition would not negatively affect the Company's ongoing financial results or ability to maintain and meet FY18 financial guidance; and that Curo's Canadian single-pay loans, its most profitable single line of business, would remain viable during and after the transition.  When Defendants elected to make such positive statements, they were under a duty to disclose the additional negative information about Curo

and the Canadian transition that would have made such statements not misleading.   However, Defendants failed to reveal this material information and, instead, omitted and concealed it from investors.

94.    In reality, the Company's rapid transition from high-yield, single-pay loans to lower yield, installment and open-end loans in Canada, and Ontario specifically, caused higher up-front provisioning and increased marketing spend, which negatively impacted net income and adjusted EBITDA, and substantially diluted the Company's earnings.   This information was material because it would have altered the total mix of information made available to reasonable investors as it related directly to a significant portion of the Company's revenues and involved the Company's most profitable single line of business in its largest Canadian market. Defendants' materially false or misleading statements and/or omissions are detailed in this section.

**A.    First Quarter 2018 Financial Results**

95.    The Class Period begins on April 27, 2018.   After the market closed on April 26, 2018, Curo issued a press release announcing its financial results for the quarter ended March 31, 2018 and affirmed the Company's FY18 guidance ("1Q18 Press Release").   The 1Q18 Press Release stated:

Fiscal 2018 Outlook

*The Company affirms its full-year 2018 adjusted earnings guidance*, a non-GAAP measure that excludes the $11.7 million of debt extinguishment costs from the retirement of $77.5 million of the 12.00% Senior Secured Notes due 2022 and stock-based compensation, as follows:

- Revenue in the range of $1.025 billion to $1.080 billion

- *Net Income in the range of $110 million to $116 million*

- *Adjusted EBITDA in the range of $245 million to $255 million*

- Estimated tax rate of 25% to 27% for the full year

- *Adjusted Diluted Earnings per Share of $2.25 to $2.40*

96.     The 1Q18 Press Release also discussed the Canadian regulatory changes and made materially false or misleading statements and/or omitted material facts concerning the Company's transition out of single-pay products to installment and open-end products in Canada. For example, comparing the Company's 1Q18 results to the previous year's financial results, the 1Q18 Press Release noted declining single-pay revenue and increasing open-end loan balances as a result of the Company's intentional "product shift" from single-pay to installment and open-end loans:

> Single-Pay revenues were flat year-over year. The effect of Single-Pay receivables growth was offset by *regulatory changes in Ontario, Canada*. Open-End revenues rose 52.0% on organic growth in the U.S. *and the introduction of Open-End products in Virginia and Canada*.
>
> \*       \*       \*
>
> Open-End loan balances increased by $25.9 million compared to March 31, 2017 from year-over-year growth in Kansas and Tennessee of 12.2% and 8.6%, respectively, the 2017 launch of Open-End in Virginia and *conversion in the fourth quarter of 2017 of a portion of Canada Unsecured Installment loans to Open-End loans. The provision for losses and Open-End Allowance for loan losses as a percentage of Open- End gross loans receivable remained consistent with the previous quarter*.
>
> \*       \*       \*
>
> Single-Pay revenue and combined loans receivable during the three months ended March 31, 2018 were affected primarily by regulatory changes in Canada (rate changes in Ontario and British Columbia) and continued product shift from Single-Pay to Installment and Open-End loans in all countries.

97.     Comparing the Company's 1Q18 Canadian segment results to the same period in 2017, the 1Q18 Press Release stated:

> Revenue in Canada was impacted by the *product transition in Alberta from Single-Pay loans to Unsecured Installment and Open-End loans and the impact of regulatory rate changes in Ontario and British Columbia*. Canada revenue improved $4.7 million, or 11.3% to $46.3 million for the three months ended March 31, 2018 from $41.6 million in the prior year period. On a constant currency basis, revenue was up $2.6 million, or 6.3%.

\*      \*      \*

The provision for losses increased $2.3 million or 22.7% to $12.6 million for the three months ended March 31, 2018 compared to $10.2 million in the prior year period, *primarily due to relative loan volumes and mix shift from Single-Pay loans to Unsecured Installment and Open-End loans*.  On a constant currency basis, provision for losses increased $1.8 million, or 17.2%.

\*      \*      \*

Operating expenses increased $1.6 million, or 45.5%, to $5.0 million in the three months ended March 31, 2018, from $3.4 million in the prior year period, *due to . . . expansion of the LendDirect business, and product shifts from Single-Pay loans to Unsecured Installment and Open-End loans*.

98.    Before the market opened on April 27, 2018, Curo hosted a conference call with analysts and investors to discuss the Company's operations and 1Q18 financial results.  During the call, Gayhardt, Dean, and Baker spoke positively about the Company's financial results and operations and the Canadian product transition.  For example, in his prepared remarks, Gayhardt credited the Company's transition out of single-pay products as one of the "key drivers" of the Company's "growth" and stated:

Current 4 key drivers for this growth: First is the continued mix shift in our products to install the (inaudible) lines of credit, which, together, accounted for 71.4% of our total revenue, up from 57.2% in the prior year quarter. . . .

99.    Gayhardt also discussed the "anticipated" regulatory changes and their impact on Ontario's single-pay business, and assured the market of the ongoing "viability" of Ontario's single-pay product:

In Canada, new rules came into effect in Ontario and lowered the maximum rate from $18 per $100 lent to $15 per $100 lent effective January 1 of this year.  And we're working to incorporate a new extended payment plan and an ability to repay guideline for release on July 1.  *We had anticipated these changes and believe that Single-Pay lending remains viable in Ontario*, although we will continue to expand our Installment and Open-End offerings in Ontario and other provinces.

100.    Gayhardt concluded his prepared remarks by stating, "we're very happy to affirm the guidance we gave you in January" and assured investors that "I'm relatively certain we have

a much higher degree of confidence in delivering on those numbers, and we look forward to discussing guidance in more detail after our June quarter."

101.    Dean also reiterated that the Company was "affirming full year 2018 adjusted earnings guidance" and noted that the Company "continue[d] to anticipate revenue in the range of $1.025 billion to $1.080 billion and with continued solid growth in the U.S. and U.K. being offset partially by declines in Canada from the additional regulatory changes in the middle of the year." Dean further "affirm[ed] adjusted EBITDA in the range of $245 million to $255 million, adjusted net income in the range of $110 million to $116 million and adjusted diluted earnings per share in the range of . . . $2.25 to $2.40."

102.    During the April 27, 2018 conference call, analysts questioned Defendants numerous times about the Canadian transition and its impact on the Company's ongoing business. For example, analysts asked specifically about the Company's portfolio "adjusting" towards installment loans and away from single-pay loans, and about the Canadian regulatory changes and any accompanying impact on Curo's overall business. Analysts also inquired about the Company's "confidence level" that credit losses and provisions as a percentage of revenue "would be relatively stable with a year ago as we go through 2018." In response, Gayhardt acknowledged that the Company's line of credit products (*i.e.*, installment and open-end loans) required "upfront provisioning," and that with the "mix shift," "the revenue and profitability from those products will lag *a little bit* just because of the way you have to provision upfront," but assured the market that any increased provisioning "trend" resulting from the product transition was "starting to . . . normalize," stating:

> So there's still some of that, but we're also starting to sort of lap some growth in those products. So it's -- I think what we're kind of getting is what I call a little bit more of a normalized phase. If we're growing revenues in the mid-teens, and a lot of that is consisting of the shift in the Installment line of credit stuff and we're starting to kind of normalize on those trends a little bit.

- 34 -

103.    Gayhardt also explicitly told investors that any upfront provisioning resulting from the product transition in Canada was already "anticipated" and factored into the Company's "2018 forecast" and "guidance," stating:

> Canada, as you mentioned, we are seeing much more pronounced kind of mix shift from Single-Pay to Installment.  We went through that in Alberta.  We're growing the LendDirect business in the stores, [went] online in Ontario, which is about 2/3 of our overall Canadian business.  You'll start to see more of that as well, so there'll be some of that provisioning, but I think we're -- *we had anticipated that and when we developed our forecast and our guidance, we -- there's nothing really going on in terms of mix shift or the overall kind of growth trends, it's that it's out of line with our forecast.*

104.    When asked about the seasonality of the Company's "earnings" and how the market should view "quarterly earnings for the next 3 quarters," Dean specifically highlighted how "Open-End and Installment growth" in Canada would result in a "depressed" 2Q18, but assured the market that any "pressure" from provisioning for losses in Canada would dissipate in 3Q18 and 4Q18.  Specifically, Dean stated, in relevant part:

> [W]e see good growth in Q2 in earning assets coming out of that trough, and we already are.  And that growth in Q2 puts pressure on provision providing on that loan growth coming out of the trough.  So Q2 is always seasonally our lowest earnings quarter of the year.  And then we pop back up in Q3 and Q4 tend to be -- the balances build through the end of Q2 and into August to peak kind of late in the third quarter and kind of stay there.  So -- and so if you think about it, you think about the Open-End and Installment growth in Canada, it basically -- you've got Q2 in a much -- is depressed.  Q3 starts to come out of that provision on loan growth pressure, and then Q4 tends to be another high quarter.  So -- and typically, Q1 and Q4 are the 2 highest.

105.    Echoing Dean's previous comments, Baker again assured the market of the viability of the Canadian single-pay product and stated, "[w]ith the new regulatory changes in Ontario, we still think Single-Pay is going to be viable."

106.    As the call continued, when asked about "targets" for the Company's "mix-shift," Gayhardt specifically discussed the Canadian transition and assured investors that the transition

out of single-pay products in Canada would not be rapid or immediate, but, instead, would occur over the "*next couple years*," stating:

> So Canada is 13%, Canada Single-Pay is 13% of total revenue, that's down from 15% last year.  I suspect you'll see that Canada number probably cut in half over the next couple of years and maybe even go lower than that depending on how -- what the take-up rate and success rate of our line of credit product is there. . . .

> And Canada, I suspect that 13% will be cut in half over the next couple of years as well.  So you could see 23% between Canada and U.S. Single-Pay revenue.  I think you could see that number go, that combined number go below 10% in the next couple of years.

107.    Analysts reacted positively to Defendants' statements on April 26 and April 27, 2018, expressing "confidence" in Curo's guidance.  For example, on April 30, 2018, Jefferies increased its price target for the Company from $21 to $30 and stated that "following the strong 1Q we have a high degree of confidence in the company's ability to achieve its strong guidance factors."

108.    On May 3, 2018, Curo filed its Form 10-Q ("1Q18 10-Q") with the SEC, which was signed by Dean and confirmed the Company's previously announced financial results and financial position.  The 1Q18 10-Q also represented that management's disclosures, controls, and procedures were effective:  "Based on an evaluation of our disclosure controls and procedures as of the end of the period covered by this report conducted by our management, with the participation of the Chief Executive Officer and Chief Financial Officer, the Chief Executive Officer and Chief Financial Officer *concluded that these controls and procedures were effective as of March 31, 2018*" ("Disclosure Control Statements").

109.    The 1Q18 10-Q included certifications required by the Sarbanes-Oxley Act of 2002 ("SOX") signed by both Gayhardt and Dean, which stated:

I, [Don Gayhardt/Roger Dean], certify that:

1.    I have reviewed this quarterly report on Form 10-Q of CURO Group Holdings Corp. (the "registrant");

2.     Based on my knowledge, *this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report*;

3.     Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.     The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a.     Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b.     (Paragraph omitted pursuant to SEC Release Nos. 33-8238/34-47986 and 33-8392/34-49313);

    c.     *Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and*

    d.     Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.     The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a.     All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b.     Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

110.    Expanding on Curo's results, the 1Q18 10-Q stated:

Open-End loan balances increased by $25.9 million compared to March 31, 2017 from year-over-year growth in Kansas and Tennessee of 12.2% and 8.6%, respectively, the 2017 launch of Open-End in Virginia *and conversion in the fourth quarter of 2017 of a portion of Canada Unsecured Installment loans to Open-End loans.  The provision for losses and Open-End Allowance for loan losses as a percentage of Open-End gross loans receivable remained consistent with the previous quarter.*

\*      \*      \*

*Single-Pay revenue and combined loans receivable during the three months ended March 31, 2018 were affected primarily by regulatory changes in Canada (rate changes in Ontario and British Columbia) and continued product shift from Single-Pay to Installment and Open-End loans in all countries.*

111.    The 1Q18 10-Q discussed the Canada segment specifically, and stated:

*Revenue in Canada was impacted by the product transition in Alberta from Single-Pay to Unsecured Installment and Open-End loans and the impact of regulatory rate changes in Ontario and British Columbia.*  Canada revenue improved $4.7 million, or 11.3% to $46.3 million for the three months ended March 31, 2018 from $41.6 million in the prior year period.  On a constant currency basis, revenue was up $2.6 million, or 6.3%.

\*      \*      \*

The provision for losses increased $2.3 million, or 22.7% to $12.6 million in the three months ended March 31, 2018 from $10.2 million in the prior year period, *primarily due to relative loan volumes and the mix shift from Single-Pay loans to Unsecured Installment and Open-End loans*.  On a constant currency basis, provision for losses increased $1.8 million, or 17.2%.

\*      \*      \*

Operating expenses increased $1.6 million, or 45.5%, to $5.0 million in the three months ended March 31, 2018, from $3.4 million in the prior year period, due to increased collections and customer support payroll expenses from seasonality, increased volumes, *expansion of the LendDirect business, and product shifts from Single-Pay loans to Unsecured Installment and Open-End loans.*  On a constant currency basis, operating expenses increased $1.3 million, or 39.2%.

112.    On May 14, 2018, Curo filed its Registration Statement on Form S-1 with the

SEC for the Selling Stockholders Offering, and on May 17, 2018, Curo filed its prospectus (the

"Selling Stockholders Offering Documents").  The Selling Stockholders Offering Documents

incorporated by reference the false and misleading statements and omissions made in the Company's 1Q18 Press Release and 1Q18 10-Q.

113.   Defendants' statements on April 26 and 27, 2018, in the 1Q18 10-Q, as set forth in ¶¶95-106, 108-112 above, and as incorporated into the Selling Stockholders Offering Documents, were materially false or misleading and/or omitted material facts.  Specifically:

(a)   Defendants' statements misrepresented and concealed the true, negative, short-term impact that the Company's transition from single-pay to installment and open-end loans in Canada would have on Curo's financial results, including massively diluting the Company's Adjusted EBITDA, net income, and EPS.  For example, Defendants credited the Company's "continued mix shift" to open-end loans as a key driver of the Company's "growth" while failing to disclose that the Canadian transition would negatively impact the Company's financials in the near term.  In addition, Defendants' statements that any increased provisioning relating to the Canadian transition was "starting to normalize," and loan growth in 2Q18 would put "pressure on provision[s]" leading to a "depressed" 2Q18, but that 3Q18 would "start[] to come out of that provision on loan growth pressure" gave investors the false impression of a smooth transition to open-end loans and that any negative impact from the initiation of the Canadian transition would dissipate by 3Q18 and would not affect the Company's ability to maintain and meet FY18 financial guidance.  In reality, the transition would materially impact the Company's ongoing financial results and FY18 guidance.

(b)   Defendants failed to disclose that the transition to open-end loans would come at the expense of the Company's Canadian single-pay revenue, which was historically Curo's most profitable single line of business.  Rather than remain "viable," single-pay revenue was being cannibalized by open-end loans during the transition.  Further, instead of being cut in half over "a couple of years," Canadian single-pay revenue would be dramatically reduced,

dropping *50%*, from approximately 16% of the Company's total revenue in 3Q17 to only 8% of the Company's total revenue by the end of 3Q18.

(c)     Defendants' statements gave investors the false impression that the upfront provisioning associated with the Canadian transition to open-end loans was already "anticipated" and factored into the Company's "forecast" and "guidance."  In truth, as a result of the transition to open-end loans in Canada, and Ontario specifically, and the resulting materially higher upfront loan loss provisioning, Defendants had no reasonable basis to expect, and did not in fact expect, that Curo could achieve FY18 net income in the range of $110 million to $116 million, adjusted EBITDA in the range of $245 million to $255 million, and EPS in the range of $2.25-$2.40.

(d)     Curo's 1Q18 10-Q was false and misleading because it failed to disclose the negative effect of the Company's transition from single-pay loans to installment and open-end loans on Curo's current period results and future financial results in violation of SEC disclosure rules, as set forth below in ¶¶161-173.

(e)     Curo's 1Q18 10-Q and the SOX Certifications Gayhardt and Dean signed were also false and misleading because they represented that the Company's disclosure controls were operating effectively when, in fact, they were not.

## B.     Second Quarter 2018 Financial Results

114.     After the market closed on July 30, 2018, Curo issued a press release announcing its financial results for the quarter ended June 30, 2018 (the "2Q18 Press Release").  In the 2Q18 Press Release, Gayhardt reiterated his "confidence" that Curo would meet its "full year guidance," stating:

> We are pleased to announce year-over-year loan growth of 26.9% and sequential loan growth of 14.1%, adjusted earnings growth in the first half of 2018 of 18.9%, and the execution of a milestone bank partner agreement that allows us to expand our lending footprint in the U.S.  *Our momentum*, improvement in credit metrics

*and solid loan growth has further bolstered our confidence in our full year earnings guidance. . . .*

115.   The 2Q18 Press Release "affirm[ed]" the Company's 2018 guidance for adjusted net income, adjusted EBITDA, and adjusted diluted EPS, and again highlighted the Company's "confidence" in meeting guidance objectives:

<u>Fiscal 2018 Outlook</u>

*We affirm our full-year 2018 adjusted earnings guidance. . . . Our solid results for the first half of 2018 and above-expectation loan growth has further bolstered our confidence in our guidance.*  Our full-year 2018 guidance is as follows:

- Revenue in the range of $1.025 billion to $1.080 billion

- *Adjusted Net Income in the range of $110 million to $116 million*

- *Adjusted EBITDA in the range of $245 million to $255 million*

- Estimated tax rate of 25% to 27% for the full year

- *Adjusted Diluted Earnings per Share of $2.25 to $2.40*

116.   The 2Q18 Press Release also made materially false or misleading statements and/or omitted material facts concerning the Company's transition from single-pay to installment and open-end loans in Canada, assuring the market that any "accelerated open-end growth" was having a minimal impact on the Company's single-pay balances.  For example, for the three months ended June 30, 2018, the 2Q18 Press Release stated:

*Single-Pay revenues were affected primarily by regulatory changes in Canada (rate changes in Alberta, Ontario and British Columbia) and continued product shift from Single-Pay to Installment and Open-End loans in all countries*.  Open-End revenues rose 72.2% on organic growth in the U.S. and the *introduction of Open-End products* in Virginia and *Canada*.  *Open-End adoption in Canada accelerated this quarter* as related loan balances grew $34.3 million sequentially from the first quarter.  *Even with the accelerated Open-End growth, Single-Pay balances in Canada only shrank sequentially by $1.4 million*.

\*       \*       \*

Open-End loan balances as of June 30, 2018 increased by $64.3 million, or 240.0%, compared to June 30, 2017 from year-over-year growth in Kansas and Tennessee of 26.9% and 20.6%, respectively, the third quarter 2017 launch of

Open-End in Virginia, conversion of most of Alberta's Unsecured Installment loans to Open-End loans *and the launch of Open-End loans in Ontario. Open-End adoption in Canada accelerated this quarter* as related loan balances grew $34.3 million sequentially from the first quarter.

The Open-End Allowance for loan losses as a percentage of Open-End gross loans receivable declined year-over-year and sequentially, primarily due to geographic mix and seasoning of the U.S. portfolio. At June 30, 2018, Canadian Open-End gross loans receivable comprised 56.4% of the total, compared to none at the end of the prior year quarter.

*       *       *

Single-Pay revenue and loans receivable during the three months ended June 30, 2018 declined slightly year-over-year, *primarily due to regulatory changes in Canada (rate changes in Alberta, Ontario and British Columbia) and continued product shift from Single-Pay to Installment and Open-End loans in all countries compared to the three months ended June 30, 2017.* Even with the aforementioned accelerated Open-End growth in Canada, Single-Pay balances in Canada only shrank sequentially by $1.4 million. Provision for losses and net charge-offs were consistent for the quarter and Single-Pay Allowance for loan losses as a percentage of gross loans receivable remained consistent sequentially.

117.    Comparing the Company's Canada Segment Results for 2Q18 to 2Q17, the 2Q18

Press Release stated:

Canada revenue improved $3.4 million, or 7.9%, to $47.0 million for the three months ended June 30, 2018 from $43.6 million in the prior year period. On a constant currency basis, revenue was up $1.6 million, or 3.6%. *Revenue growth in Canada was impacted by the product transition from Single-Pay loans to Unsecured Installment and Open-End loans and the impact of regulatory rate changes in Alberta, Ontario and British Columbia.*

Single-Pay revenue decreased $1.6 million, or 4.6%, to $33.3 million for the three months ended June 30, 2018 and Single-Pay ending receivables decreased $1.1 million, or 2.2%, to $47.3 million from $48.4 million in the prior year period *due to mix shift in Ontario where we launched Open-End loans in the fourth quarter of 2017.*

Canadian non-Single-Pay revenue increased $5.0 million, or 58.4%, to $13.7 million compared to $8.6 million the same quarter a year ago on $31.9 million, or 74.5%, growth in related loan balances. *The increase was primarily related to the launch of Open-End products in Alberta and Ontario in the fourth quarter of 2017.*

The provision for losses increased $4.1 million, or 39.4%, to $14.4 million for the three months ended June 30, 2018 compared to $10.3 million in the prior year

period, *because of upfront provisioning on relative loan volumes* (total Open-End and Installment loans grew sequentially by $20.9 million this second quarter compared to $10.9 million in the second quarter of 2017), *and mix shift from Single-Pay loans to Unsecured Installment and Open-End loans*.  On a constant currency basis, provision for losses increased $3.5 million, or 33.7%.

*     *     *

Operating expenses increased $1.6 million, or 45.5%, to $5.0 million in the three months ended March 31, 2018, from $3.4 million in the prior year period, due to increased collections and customer support payroll expenses from seasonality, increased volumes, *expansion of the LendDirect business, and product shifts from Single-Pay loans to Unsecured Installment and Open-End loans*.  On a constant currency basis, operating expenses increased $1.3 million, or 39.2%.

118.   Before the market opened on July 31, 2018, Curo hosted a conference call with analysts and investors to discuss the Company's operations and 2Q18 financial results.  During the call, Gayhardt, Dean, and Baker spoke positively about the Company's financial results and the Canadian product transition.  For example, in his prepared remarks, Gayhardt discussed the Company's quarter from an "operational standpoint" and highlighted the "successful introduction" of the transition in Ontario, and stated:

> We made great progress on. . . *the early stage of a very successful introduction transition of a big part of our Ontario lending business of the legacy single-pay loan product to a line of credit that's been very well-received by our customers*.

> We'll unpack the Ontario transition in some detail later on, but *it's a big undertaking that's going very well and is running well ahead of schedule*.  We did all this while maintaining our credit and other financial disciplines.  These are big projects that require many people from many departments to work together, and we're incredibly proud of all of our CURO team members for giving this a huge effort this quarter.

119.   Gayhardt also commented on the Company's increased "provision build" and "advertising expenses" in 2Q18:

> From a bottom line perspective, the quarter was very good, *but the provision build associated with the second quarter asset growth increased advertising expenses for our newer brands* and the expenses related to the ongoing affordability settlements in the U.K. combined to keep earnings from coming in at a level that we would characterize as excellent.  *But the good news is our U.S. business is*

- 43 -

*extremely strong and performing in a way that more than makes up for any shortfall from our international operations.*

120.   Clearly understanding investor interest in the transition from single-pay to installment and open-end loans in Ontario, Gayhardt stated that the Canadian product transition was "too fluid" to "completely discount *a bit* of downside risk" on the Company's FY18 guidance, but nevertheless tempered investor concerns about any negative impact to the Company's financial position by re-affirming Curo's FY18 guidance.  Specifically, Gayhardt again highlighted the Company's "*high degree of confidence*" in achieving guidance, even going so far as to tell investors that there was a "good likelihood" that the Company would ***beat*** guidance estimates:

> *We are affirming our guidance today ... we have a very high degree of confidence in achieving our guidance objections.*  And, obviously, today we're about 60% of the way through the year, so that certainly helps.  And our confidence in our core business and products is very high.  It's probably just that the Canadian product transition and the U.K. affordability issue are both too fluid for us to completely discount *a bit of downside risk* on both those fronts.

> So looking at our current forecast, *we expect our Canadian* and U.K. *operations to fall short of our operating earnings plan for the full year 2018 in the range of $10 million* -- that's U.S. $10 million.  So sitting here today, we do think, as I just mentioned, the U.S. business will be able to make – to more than make up for these projected international shortfalls, *and we believe that there's a good likelihood that we'll come out ahead on our internal forecasts and our published guidance.*

121.   Gayhardt also informed investors that Curo had "moved up" the introduction of the transition in Ontario from 2019 to 2Q18, but concealed from investors that instead of moderating the transition over several years, the majority of the transition ***had already occurred***. Specifically, Gayhardt stated:

> First, in Canada, as I mentioned earlier, ongoing changes in the provincial regulation of single-pay lending in Canada, coupled with our growing competencies in marketing, underwriting and servicing line of credit products, *brought us to the decision to accelerate the transition of our product offerings, particularly in Ontario, which accounts for about 2/3 of our Canadian revenue.*

- 44 -

Although we anticipated introducing a line of credit product in our Ontario locations during 2019, *early test results we initiated in February of this year were incredibly favorable in terms of acquisition costs, credit performance, take-up rates, line utilization, and really the whole deal, so we moved up our -- we simply moved up our conversions schedule*.

122.    Gayhardt explained the Ontario transition's concomitant impact on the

Company's provisioning and marketing as follows:

So what does that mean?  It means higher earning asset balances in our line of credit portfolio in Canada than previously forecasted, but lower yields and lower revenue while the book builds and *higher provision when larger balance dollars are originated.*

We started the quarter with just over $53 million in non-single-pay – these are all U.S. dollars, by the way.  We started the quarter with just over $53 million in non-single-pay balances, and we ended the quarter with $74.7 million, and *having booked the kind of larger marketing and convergence plan in late June, the balances today sit at over $115 million, so great growth, all driven by tremendous customer communication and service by our store and call center teams in Canada.*

123.    Gayhardt sought to allay any investor concerns from the Company's decision to

move up the introduction of the transition in Ontario from 2019 to 2Q18 by explaining that any

negative impact would be temporary and, in fact, had already manifested in 2Q18:

As I mentioned, short-term, this approach diluted earnings for the quarter. There's really no question we could have had better earnings had we taken a more incremental approach, and it will impact earnings for the full year versus our plan, but long-term, if the portfolio continues to build through the remainder of the year, our exit rate will be very high, and we'll have a much more diverse and stronger business in Canada that will drive substantial operating earnings gains in Canada in 2019.

124.    In a clear effort to further appease investor concerns about any negative impact to

the Company's ongoing financial results, in his prepared remarks Dean falsely told investors he

was "happy" that the worst was behind them when it came to increased loan loss provisioning,

noting that Company-wide provisioning would be "less noisy" in the second half of the year:

I'm happy to say that we should expect less noisy comps for loss provisioning in the second half of the year.  The growth rate for provision expense should match up better with revenue growth rates for the next couple quarters.

- 45 -

125.    Dean shed some additional light on the Company's increased advertising expense

for the quarter, blaming the Company's targeted transition away from single-pay loans, expanded

marketing channels, and the ramp up of Canada's LendDirect brand:

> Canadian advertising rose 19.4% for three reasons.  Number one, mix.  We are
> targeting and acquiring more installment loan and open-end customers than a year
> ago.  Two, the marketing channels we're using.  We have expanded cable TV and
> direct mail spend in Canada.  And three, the new product expansion -- supporting
> new product expansion, including the LendDirect stores in Canada, and increased
> spend to support the ramp-up of the LendDirect brand.

126.    Reiterating his comments in the previous quarter regarding the viability of

Canadian single-pay loans, Dean affirmed that while "open-end adoption in Canada accelerated

this quarter," Canada's single-pay revenues decreased a minimal amount:

> [Gayhardt] mentioned that open-end adoption in Canada accelerated this quarter.
> The open-end balances actually grew $34 million sequentially from first quarter,
> and it was encouraging that even with this acceleration of the open-end product,
> Canadian single-pay balances shrank sequentially just $1.4 million.

127.    Dean again affirmed guidance and told investors that the Company was "already

at the top end of revenue guidance," that the second half of the year would have more favorable

EBITDA than the first, and downplayed the impact of any mix-shift in Canada, stating:

> Finally, I'll close with our full year outlook for 2018.  *Like [Gayhardt]
> mentioned, we are reiterating -- or we are affirming our full year 2018 adjusted
> earnings guidance.*  That's a non-GAAP measure that excludes one-time items,
> like the aforementioned share-based compensation.

> We continue to anticipate revenue in the range of $1.025 billion to $1.080 billion,
> with continued solid growth in the U.S. and U.K. being offset partially by *modest
> declines in Canada from the additional regulatory changes and mix shift there*.  In
> fact, if you do the first half second math -- second half math, at this point, *we'd be
> surprised if we weren't already at the top end of the revenue guidance range*.

> Adjusted EBITDA in the range of -- our adjusted EBITDA will fall in the range
> of $245 million to $255 million, and our adjusted net income will be in the range
> of $110 million to $116 million, with adjusted diluted earnings per share in the
> range of $2.25 to $2.40.

> One other thing to point out about the full year, if you look at our last year
> numbers, adjusted EBITDA for the first half of the year was higher than the

second half of the year.  There are a lot of reasons for that, but our guidance for this year implies that that will flip this year.  In other words, we reported $124 million of adjusted EBITDA through the first 6 months of 2018.  *At the midpoint of our guidance, that means we would exceed $126 million of adjusted EBITDA for the second half of the year with related higher year-over-year growth rates.*

128.    During the July 31, 2018 conference call, analysts specifically questioned Defendants about the Company's FY18 guidance and any assumptions on the "low end to the high end of the EPS guidance," as well as any seasonality that would impact 3Q18 or 4Q18.  In response, Gayhardt acknowledged that the Company was a "little cautious" in terms of the Ontario transition and did not want to "overpromis[e] or underproject [] on what's happening in Canada," but concealed from investors that the majority of the Ontario transition (and its concomitant increased provisioning) had already occurred as of July 31, 2018 and would have detrimental effects on 3Q18 and the Company's FY18 guidance.  Instead, he falsely reassured analysts and investors that "*we would expect that our provision in the second half of the year would run about with revenue.*"

129.    Dean reiterated his previous comments that provisioning would have a less negative impact on revenue in 3Q18 and 4Q18, and added: "*It'll be close.  It will be much closer, much less noisy than the first half.*"

130.    Agreeing with Dean, Gayhardt explained that "if revenue is going to grow in that 15% range, 14%, 15% range, provision grows in that, so net revenue growth should run about with gross revenue growth."  Gayhardt further discussed the increased advertising initiatives the Company was undertaking as part of the transition, and – for the third time on the conference call – confirmed that "*provisioning should be in line with revenue*" for the second half of the year:

> The other, bigger piece of the P&L, from an advertising standpoint, *given the continued transition in Ontario* -- there's some ad support for that.  *Again, that's transitioning existing customers, but we are getting a really good take-up rate from new customers, so we're going to continue to advertise.  As we like to say, if you live in Ontario, it's very -- unless you're kind of living in a cave, we think we've reached you multiple times with this advertising, but we're going to*

*continue to push that.* So we would expect -- in that and our Avio product in the U.S., we would expect that our ad spend as a percentage of revenue -- last year, I think it was about 6.5% in the second half of the year. It'll likely go up maybe 140, 150 basis points, in the 7.8% to 8% range, for the back half of the year. So that'll be a bit higher than last year, but, again, *the revenue growth is there and the provisioning should be in line with revenue*.

131.    Gayhardt concluded by assuring the market of "revenue growth" in Canada for the year, despite reductions "on the earnings side" resulting from the transition in Ontario, and touted the Company's ability to "afford" and maintain "positive" "numbers":

> And just one more comment, just for the context. As I mentioned, we did $186 million in revenue in Canada last year, U.S. dollars, *and our forecast is we'll do right -- for the full year this year, we'll do right around $200 million, so we'll see some revenue growth,* but adjusted EBITDA last year in that business, in U.S. dollars, was $54.6 million. We could see in the range of a $20 million reduction in that adjusted EBITDA number. *We initially thought it was going to be down in the $10 million range. It could be more than double that down, given the acceleration of the transition. So that's a really meaningful hit on the earnings side, but the flip side of that, as I mentioned, if we get through this transition, the exit rate should put us on a path to get back to that 2017 EBITDA number.* Now, this is not a forecast, I just want to make it very clear, but that's -- when we talk about objectives internally and think about things, it's our idea that we're going to get back to that 2017 adjusted EBITDA number. We may not get all the way back there in '19, but we're certainly going to be -- we'll get a large measure of it back. *And when you look at that from an earnings growth standpoint, and fortunately,* the U.S. side of the business is doing well enough for us to be able to sort of of, *I guess, afford to do that transition and still have our overall numbers be really, really positive.*

132.    When questioned about whether the decline in single-pay in Canada would "accelerate," Baker discussed the success of the Windsor, Ontario test stores and assured investors that any decline would be temporary before bouncing back and that Canadian single-pay was still "an extraordinary viable product," stating:

> I mean, when we ran the test, we did 21 testers in Ontario starting in February, and what we experienced there with single-pay is we did see a decline due to all the things that Don just talked about with the line of credit, but we did see it start to come back, and we expect to see the same thing in the broader Ontario rollout. . . . So we expect that to come back a bit, and I think that will temper the decline on single-pay, but clearly there's a big transition, but we -- if you look at the yields, even with the extended payment plan and the net income limitations, it still yields around 200%, so it's an extraordinary viable product, and we don't necessarily

want to be out of that business in Ontario, so it's a bit of a balancing act to make sure we offer the right product to the right customer.

133.    As a result of Defendants' false or misleading statements and/or omissions, analysts and investors were under the false impression that any negative impact from the introduction of the transition to open-end loans in Ontario had occurred in the just-reported quarter and would not impact the Company's future results or FY18 guidance.  For example:

(a)    On July 30, 2018, Stephens issued an analyst report stating, "2Q18 results were strong, and imply to us the need to raise our EPS estimates . . . .  Since provisions are one-time and revenues are ongoing, that would imply upside to our future EPS estimates."

(b)    On July 31, 2018 Credit Suisse gave Curo an "OUTPERFORM" rating and observed: "Results were strong in the U.S., but somewhat weaker in Canada and the U.K., though [management] expressed confidence that the pricing changes in Canada should allow CURO to diversify its business and drive operating earnings in Canada in 2019.  Net results were in-line with expectations, though [management] indicated there is a good likelihood that CURO will come in above guidance range in 2018."  Credit Suisse further noted, "CURO accelerated transition towards open line of credit product in Ontario this quarter, resulting in a significant ramp up in Canada open-ended balance."

(c)    On July 31, 2018, Janney Montgomery Scott LLC ("Janney") issued an analyst report reiterating its "buy" rating for Curo common stock and noted: "This rise in the provision expense is really what kept CURO from reporting much better than expected 2Q:18 results." Commenting on open-end loan growth, Janney stated, "Clearly, open-end growth is an outlier, which was driven by an earlier than expected roll out of this product in Canada."

134.    On August 2, 2018, Curo filed its Form 10-Q ("2Q18 10-Q") with the SEC, which confirmed the Company's financial results and financial position from the 2Q18 Press Release, was signed by Dean, and included Disclosure Control Statements that were substantially similar

to the statements above at ¶108.  The 2Q18 10-Q also included SOX Certifications signed by

Gayhardt and Dean that were substantially similar to the Certifications described above at ¶109.

135.    Discussing the Company's 2Q18 financial results and the Canadian transition, the

2Q18 10-Q stated:

> *Single-Pay revenues were affected* primarily by regulatory changes in Canada (rate changes in Alberta, Ontario and British Columbia) and continued product shift from Single-Pay to Installment and Open-End loans in all countries.  Open-End revenues rose 72.2% on organic growth in the U.S. *and the introduction of Open-End products in* Virginia and *Canada.  Open-End adoption in Canada accelerated this quarter as related loan balances grew $34.3 million sequentially from the first quarter.  Even with the accelerated Open-End growth, Single-Pay balances in Canada only shrank sequentially by $1.4 million*.
>
> *                *                *
>
> Open-End loan balances as of June 30, 2018 increased by $64.3 million, or 240.0% compared to June 30, 2017 from year-over-year growth in Kansas and Tennessee of 26.9% and 20.6%, respectively, the third quarter of 2017 launch of Open-End in Virginia, *conversion of most of Alberta's Unsecured Installment loans to Open-End loans and the launch of Open-End loans in Ontario.  Open-End adoption in Canada accelerated this quarter as related loan balances grew $34.3 million sequentially from the first quarter.*
>
> The Open-End Allowance for loan losses as a percentage of Open-End gross loans receivable declined year-over-year and sequentially, primarily due to geographic mix and seasoning of the U.S. portfolio.  At June 30, 2018, Canadian Open-End gross loans receivable comprised 56.4% of the total, compared to none at the end of the prior year quarter.

136.    Comparing the Company's year-over-year Canada segment results, the 2Q18 10-

Q reported:

> Canada revenue improved $3.4 million, or 7.9%, to $47.0 million for the three months ended June 30, 2018 from $43.6 million in the prior year period.  On a constant currency basis, revenue was up $1.6 million, or 3.6%.  *Revenue growth in Canada was impacted by the product transition from Single-Pay loans to Unsecured Installment and Open-End loans and the impact of regulatory rate changes in Alberta, Ontario and British Columbia*.
>
> Single-Pay revenue decreased $1.6 million, or 4.6%, to $33.3 million for the three months ended June 30, 2018 and Single-Pay ending receivables decreased $1.1 million, or 2.2%, to $47.3 million from $48.4 million in the prior year period *due*

*to mix shift in Ontario where we launched Open-End loans in the fourth quarter of 2017.*

Canadian non-Single-Pay revenue increased $5.0 million, or 58.4%, to $13.7 million compared to $8.6 million the same quarter a year ago on $31.9 million, or 74.5%, growth in related loan balances. *The increase was primarily related to the launch of Open-End products in Alberta and Ontario in the fourth quarter of 2017.*

The provision for losses increased $4.1 million, or 39.4%, to $14.4 million for the three months ended June 30, 2018 compared to $10.3 million in the prior year period, *because of upfront provisioning on relative loan volumes (total Open-End and Installment loans grew sequentially by $20.9 million this second quarter compared to $10.9 million in the second quarter of 2017), and mix shift from Single- Pay loans to Unsecured Installment and Open-End loans. On a constant currency basis, provision for losses increased $3.5 million, or 33.7%.*

137.    The statements Defendants made on July 30 and 31, 2018, and in the 2Q18 10-Q, as set forth in ¶¶114-132, 134-136 above, were materially false or misleading and/or omitted material facts.  Specifically:

(a)    Defendants' statements misrepresented and concealed the true, negative, short-term impact that the Company's transition from single-pay to open-end loans in Canada, and specifically Ontario, would have on Curo's financial results, including massively diluting the Company's Adjusted EBITDA, net income, and EPS.  In fact, unbeknownst to investors, at the time of Defendants' statements on July 30, July 31, and August 2, 2018, Curo had completed the "majority" of its rapid transition to open-end loans in Ontario, which had already resulted in larger open-end loan balances, materially higher up-front provisioning, and increased marketing spend.  Thus, Defendants' statements that the transition "diluted earnings for the [just-reported] quarter" and that "[t]he growth rate for provision expense should match up better with revenue growth rates for the next couple quarters" gave investors the false impression that any negative impact from the Canadian transition had occurred in 2Q18, but would not affect the Company's 3Q18 results or FY18 guidance when, in reality, the transition was already impacting, and would impact, the Company's ongoing financial results and FY18 guidance.  Moreover, when

Defendants assured the market of "positive" Canadian revenue growth and a reduction in Canada adjusted EBITDA for the year of only "$20 million" instead, the Company would report an 8.8% year-over-year decline in Canadian revenue in 3Q18, and a *$28.7 million* reduction in Canada adjusted EBITDA for FY18, a decline of approximately *52.6%* from the previous year.

(b)     Defendants failed to disclose the rapid nature of the transition in Ontario from single-pay to open-end loans and the negative short-term impact that the expedited transition had already had on the Company's operations and financial results, and, instead, gave investors the impression that Defendants were merely "mov[ing] up" the start date of the multi-year transition in Ontario from 2019 to 2Q18, concealing that as of July 31, 2018, the majority of the transition was already complete.   Further, the Company did not "maintain[] its financial disciplines" during the transition because, in reality, Defendants intentionally did not moderate the flow of customers from single-pay to open-end loans, which resulted in a rapid rate of loan growth, larger open-end loan balances, and higher up-front provisioning.

(c)     Defendants failed to disclose that the transition to open-end loans would come at the expense of the Company's Canadian single-pay revenue, which was historically Curo's most profitable single line of business.   Rather than remaining an "extraordinar[ily] viable product" and any "decline on single-pay" being "temper[ed]," single-pay revenue was being cannibalized by open-end loans during the transition.   Indeed, Canadian single-pay revenue would be dramatically reduced, dropping *50%*, from approximately 16% of the Company's total revenue in 3Q17 to only 8% of the Company's total revenue by the end of 3Q18.

(d)     As a result of the rapid transition to open-end loans in Ontario, which resulted in materially high upfront loan loss provisioning and increased marketing spend, the majority of which had already occurred when Defendants' reaffirmed guidance on July 30 and

July 31, 2018, Defendants had no reasonable basis to expect or have "confidence" in, and did not in fact expect, that Curo could achieve FY18 net income in the range of $110 million to $116 million, adjusted EBITDA in the range of $245 million to $255 million, and EPS in the range of $2.25-$2.40.

(e)     Curo's 2Q18 10-Q was false and misleading because it failed to disclose the negative effect of the Company's transition from single-pay to installment and open-end loans on Curo's current period results and future financial results in violation of SEC disclosure rules, as set forth below in ¶¶161-173.

(f)     Curo's 2Q18 10-Q and the SOX Certifications Gayhardt and Dean signed were also false and misleading because they represented that the Company's disclosure controls were operating effectively when, in fact, they were not.

138.     Approximately two months later, between September 25 and 26, 2018, Baker sold a total of 56,844 shares of Curo common stock for proceeds totaling $1,792,351.

## VI.     THE TRUTH EMERGES

139.     The truth about Curo's transition from single-pay to open-end loans in Canada, and specifically Ontario, and the materially negative impact to the Company's current and future financial results caused by the rapid transition was revealed to investors after the market closed on October 24, 2018.   On that day, Curo issued an after-hours press release announcing its financial results for the quarter ended September 30, 2018 (the "3Q18 Press Release").   The 3Q18 Press Release shocked the market by reporting dismal financial results and withdrawing the Company's FY18 guidance.   Specifically, Curo reported EPS of $0.23 and adjusted EBITDA of $38 million for the quarter, both substantially below consensus and analysts' estimates of $0.52 and $58 million, respectively, and revised and lowered FY18 guidance as follows:

- Adjusted Net Income in the range of $88 million to $91 million compared to prior range of $110 million to $116 million

- Adjusted EBITDA in the range of $215 million to $218 million compared to prior range of $245 million to $255 million

- Adjusted Diluted Earnings per Share of $1.84 to $1.88 compared to prior range of $2.25 to $2.40

140. Despite Defendants' multiple assurances throughout the Class Period that the Company had "anticipated" and factored into the Company's guidance any increased provisioning from the Canadian transition, Defendants nevertheless blamed the substantial earnings miss and lowered guidance on the Canadian transition, stating:

> We were pleased with our team's ability to drive robust loan growth ahead of plan in all three countries in the third quarter, *but this rate of growth resulted in elevated provisioning levels which drove earnings below our expectations. Results were particularly affected by the acceleration of Open-End loan product in Canada* where we added $87.4 million of Open-End loan balances during the third quarter, which well exceeded our expectations. The related upfront loan loss provisioning caused Canadian net revenue and Adjusted EBITDA to drop by $10.9 million and $13.2 million sequentially, respectively, compared to the second quarter of 2018.

141. Specifically, the 3Q18 Press Release disclosed:

- Canadian revenue decreased $4.4 million, or 8.8%, to $46.2 million for the three months ended September 30, 2018 from $50.7 million in the prior year period.

- Canadian provision for losses increased $8.7 million, or 55.5%, to $24.4 million for the three months ended September 30, 2018 compared to $15.7 million in the prior year.

- The cost of providing services in Canada increased $2.0 million, or 10.3%, to $21.3 million for the three months ended September 30, 2018, compared to $19.3 million in the prior year period, due, in part, to rising advertising costs, which rose $0.8 million, or 28.2%.

- Canadian Adjusted EBITDA decreased $15.36 million from $11.9 million to ($3.39 million) for the three months ended September 30, 2018, compared to the prior year period.

- Canadian Net Revenue decreased $13.16 million, or 37.7%, to $21.77 million from $34.94 million for the three months ended September 30, 2018, compared to the prior year period.

- Canadian Operating Income decreased $16.8 million from $10.9 million to ($5.9 million) for the three months ended September 30, 2018, compared to the prior year period.

142.    Before the market opened on October 25, 2018, Curo hosted a conference call with analysts and investors to discuss the disappointing financial results.    Gayhardt acknowledged that the quarter "fell short" and that "*[b]y far the biggest impact to quarterly results was the ongoing product migration in Canada, specifically in the province of Ontario*." Gayhardt elaborated on the Canadian transition, revealing that Curo's single-pay business was suffering and, stating:

> For reference, Ontario accounts for approximately 2/3 of our Canadian business. . . . The downside, of course, is we're dramatically reducing our Canadian Single-Pay revenue which historically has been our most profitable single line of business, very high yields with modest and very consistent credit losses, but a business line which has been impacted by a steady run of provincial regulatory reviews that resulted in lower fees and a range of other provisions and increased operational complexities and reduced the attractiveness of a Single-Pay product for our Canadian consumers.  But in reviewing detail in the release, we did lose money in Canada in the third quarter as an 8.8% drop in year-over-year revenue, coupled with provisions for loan loss as a percentage of revenue at 52.9% versus 31% in the prior year generated an adjusted EBITDA loss of $3.4 million, which is $15.4 million lower than last year's adjusted EBITDA of $12 million and $13.2 million lower sequentially than the second quarter of 2018.

143.    Dean explained that "[t]he Canadian business missed adjusted EBITDA by $12.1 million on loan portfolio mix shift and upfront provisioning on acceleration of Open-End in Ontario."  Contrary to Defendants' previous assertions throughout the Class Period that loan loss provisioning would be "in line" with revenues for 3Q18 and 4Q18, Dean stated:

> [W]e missed our expectation by $17 million, $18 million, something -- for the quarter.  *2/3 or 3/4 of that was with Canada, and the combination in Canada was not just with the provisioning on the loan book, but I also mentioned that our Single-Pay balances, we liquidated or converted almost $12 million of Single-Pay balances.  So the revenue -- in the quarter, the revenue was well below our expectations from that conversion and the provision was much higher*.

144.    Notably, when questioned by analysts about the "tension between the growth rate and meeting guidance" and the Company's "decision process" to pursue Canadian open-end

loans, Gayhardt admitted that Defendants failed to explain to investors *in April or July 2018* the then-known negative consequences of the Canadian transition from single-pay to installment and open-end loans, stating:

> *I think it's a very fair criticism that we did a less than stellar job of explaining in our -- probably our July call or even back into our April call, what was going -- the impact of this on sort of -- in the near term.*   It accelerated faster than we thought, the people up there did a great job with customers, et cetera, but we *probably didn't lay it out for everybody as explicitly as we probably should have. And we'll try not to make that mistake again*.

145.   Defendants further disclosed that instead of phasing out single-pay loans over the course of a few years, the "transition to line of credit in Ontario and Alberta was . . . complete."

146.   In fact, Dean also admitted that Defendants knew *in July 2018*, when Defendants confidently reaffirmed Curo's FY18 guidance, that their decision to move up and rapidly complete the Canadian transition had already had a negative effect on the Company's financial results, stating:

> I mean, if you just look at Canada, and we're sensitive to the earnings impact, and doing what we say we're going to do.  *But I think if you just look at the loss in the quarter, I mean, the majority of that actually came in July when we did it.*   It does rebound very quickly, and I think one option would have been to kind of grind through this over a quarter or 2, which may have, short-term, lessened the earnings impact but, I think, long-term, we're all going to be very happy that we put the focus and effort into the conversion.

147.   Then, Defendants revealed what had previously been concealed from investors: the transition to open-end loans in Ontario was abrupt and massive.  Dean explained that in 3Q18 alone, open-end loan balances grew $87.4 million – almost "90%" of that from Ontario, and that single-pay loan balances declined $11.2 million "entirely because of conversion of Single-Pay customers in Ontario to Open-End."

148.   Dean further disclosed that in connection with moving up and rapidly completing the transition in Ontario, the Company's advertising expense had risen 28.2% in 3Q18 compared to the previous year, explaining:

First was mix.  We were acquiring more Installment and Open-End customers versus Single-Pay.  Two, the marketing channels.  We've expanded cable TV and direct mail spend and other media spend, especially in July when we launched -- when we introduced Open-End in Ontario; and three, new product expansion, including our LendDirect stores . . . . As a result, Canadian costs per funded was $112, that's up $24 from the same quarter a year ago and up sequentially from $87 last quarter.

149.    On this news, the price of Curo common stock tumbled, falling *33.6%*, or $7.69 per share, from a closing price of $22.87 per share on October 24, 2018, to $15.18 per share on October 25, 2018, on unusually heavy trading volume.

150.    Analysts were quick to comment on the Company's surprisingly disappointing results.  For example, on October 26, 2018, Stephens issued an analyst report lowering its price target for the Company from $38 to $22 and commented that:

The miss and the resulting pain to CURO shares appears to be self- inflicted, driven by 1) over aggressive growth in the Canadian line of credit product, and 2) a lack of visibility into the scenarios of the guide down, either at the 2Q18 call or during the debt raise.

151.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of Curo stock as the artificial inflation was removed, Plaintiff and other Class members suffered significant losses and damages.

## VII.    POST-CLASS PERIOD REVELATIONS

152.    On November 8, 2018, Gayhardt, Dean, and Baker presented at the Stephens Conference, and shed additional light on the just-completed transition in Ontario.  Specifically, Defendants reiterated that in 1Q18, they decided to move up the transition from single-pay to installment and open-end loans in Ontario from 2019 to 2Q18, and that they intentionally refused to moderate the speed of the transition.

153.    For example, Gayhardt explained that increased regulations in Ontario in 4Q17 and 1Q18 prompted Defendants to make a "real decision" about the continued viability of single-pay products in Ontario.  Based on their discussions, Defendants "felt that over the long-haul . . .

the [open-end] product was the right way to go," which resulted in the decision to begin testing

open-end loans in Windsor, Ontario in February 2018.  The positive results from the Windsor

test stores "drove the decision to convert the remaining . . . branches in Ontario" resulting in

"real accelerati[on] in Q2 and Q3 of 2018."  In response to an analyst inquiry regarding the

Company's decision to "turn on the spigot for the Canadian transition," Gayhardt confirmed his

previous admission that the "remaining part of the Ontario transition [started] in probably, May .

. . June in honest."

154.    Gayhardt also disclosed that Defendants "intentional[ly]" refused to slow the

speed of the transition, stating, "we didn't put any sort of speed bumps in there intentionally to

kind of slow it down."  Indeed, in response to an analyst question regarding the "timing" of the

transition, given the market's "expectations" that the Ontario transition "was going to smoothly

happen over 2019," Dean noted that Defendants made the deliberate choice not to "moderate"

the speed of the transition, despite the known operational risks, due to fear of losing customers:

> So, when you think about having somebody at the window at the branch on the
> phone or on your mobile app that you know, you would say yes to today for the
> line of credit, but you're going to say no to sort of moderate. That just didn't
> make sense, right, I mean from an investment perspective. So, we're going to say
> no to you today, but we're saying yes to you next quarter. I think you risk losing
> that customer, you risk defaulting that, there's a whole bunch of reasons I don't
> think that makes sense strategically long-term, but it certainly was dilutive in the
> short-term.

155.    Baker further explained how the Company had converted almost 40,000

customers to open-end loans in 3Q18 alone, but expected to convert only 4,000 to 5,000

customers a month going forward, demonstrating the massive scale of the transition in Ontario.

156.    On November 11, 2018, Curo filed its 3Q18 Form 10-Q with the SEC, and

disclosed that Canadian single-pay revenue had been dramatically reduced by the end of 3Q18,

dropping an astounding 50% to only 8% of the Company's total revenue, compared to

approximately 16% of the Company's total revenue in 3Q17.

157.    On January 31, 2019, Curo reported its financial results for 4Q18 and the year-ended December 31, 2018, disclosing that revenue from single-pay loans in Canada had dropped even more, down to only 7% of the Company's total revenue for 4Q18, a more than *50%* drop from 4Q17.  For the year, single-pay loans declined to only 10% of the Company's total revenue in 2018, down from 15% the prior year.  The Company's rapidly shrinking Canadian single-pay revenues, which contracted 50% fourth quarter-over-fourth quarter and almost 35% in a single year, stood in stark contrast to Defendants' Class Period assurances that single-pay loans would remain extraordinarily "viable" in Canada and that single-pay revenue would be "cut in half over the next couple of years."

158.    On March 18, 2019, Curo filed its 2018 10-K.  In it, the Company admitted that the rapid completion of the transition to open-end loans in Ontario "came at the expense of single-pay balances."  The Company also reported that FY18 Canadian adjusted EBITDA had declined by $28.7 million, or 52.6%, compared to the previous year, significantly more than the "$20 million reduction" in adjusted EBITDA Defendants had told investors to expect.  Curo also disclosed that as of December 31, 2018, the Company's "disclosure controls and procedures *were not effective* and did not provide reasonable assurance . . . to ensure that information required to be disclosed in reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC rules and forms."

159.    The Company's admitted disclosure problems regarding the transition to open-end loans in Canada drew more than investor ire.  In its 1Q19 10-Q, Curo disclosed that it had "received an inquiry from the SEC regarding the Company's public disclosures surrounding its efforts to transition the Canadian inventory of products from Single-Pay loans to Open-End loans."

160.     The price of Curo common stock has not recovered from its Class Period high of

$31.11 per share and closed at approximately $10.00 per share as of May 30, 2019.

## VIII.   BY FAILING TO DISCLOSE THE TRUE IMPACT OF THE RAPID TRANSITION TO OPEN-END LOANS IN CANADA, DEFENDANTS VIOLATED SEC DISCLOSURE RULES

161.     SEC rules and regulations explicitly required Defendants to disclose the financial

ramifications associated with the Company's strategy to rapidly complete the transition from

single-pay to installment and open-end loans in Canada, and specifically Ontario, during the

Class Period.

162.     Item 303 of SEC Regulation S-K, 17 C.F.R. § 229.303, required Curo's quarterly

Forms 10-Q to describe "any known trends or uncertainties that have had, or that the registrant

reasonably expects will have, a material favorable or unfavorable impact on net sales or revenues

or income from continuing operations."  17 C.F.R. § 229.303(a)(3)(ii).  This regulation mandates

that the Forms 10-Q Curo filed with the SEC during the Class Period disclose "any unusual or

infrequent events or transactions or any significant economic changes that materially affected the

amount of reported income from continuing operations and, in each case, indicate the extent to

which income was so affected."

163.     The instructions to Item 303(a) of Regulation S-K explain that Curo's

Management's Discussion and Analysis ("MD&A") disclosure during the Class Period was to

"focus specifically" on material events and uncertainties that would cause the Company's

reported financial information not to be necessarily indicative of future operating results,

including "matters that would have an impact on future operations and [matters that] have not

had an impact in the past" stating, in pertinent part:

> The discussion and analysis shall *focus specifically on material events and
> uncertainties known to management that would cause reported financial
> information not to be necessarily indicative of future operating results or of future
> financial condition.  This would include descriptions and amounts of (A) matters*

*that would have an impact on future operations and have not had an impact in the past,* and (B) matters that have had an impact on reported operations and are not expected to have an impact upon future operations.

164.    Concerning material events and uncertainties, in 1989, the SEC issued interpretative guidance on Item 303 of Regulation S-K, which states, in pertinent part:

> A disclosure duty exists where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial condition or results of operation.
>
> *          *          *
>
> Events that have already occurred or are anticipated often give rise to known uncertainties.  For example, a registrant may know that a material government contract is about to expire.  The registrant may be uncertain as to whether the contract will be renewed, but nevertheless would be able to assess facts relating to whether it will be renewed.  More particularly, the registrant may know that a competitor has found a way to provide the same service or product at a price less than that charged by the registrant, or may have been advised by the government that the contract may not be renewed.  The registrant also would have factual information relevant to the financial impact of non-renewal upon the registrant. *In situations such as these, a registrant would have identified a known uncertainty reasonably likely to have material future effects on its financial condition or results of operations, and disclosure would be required.*

165.    In December 2003, the SEC issued additional interpretative guidance on Item 303 of Regulation S-K (the "2003 Interpretive Release").  This guidance makes clear that Curo's MD&A disclosure during the Class Period was required to provide disclosure about known demands, events or uncertainties, like its strategy to transition customers from single-pay to installment and open-end loans in Canada, unless management determined: (i) they were not reasonably likely to occur; or (ii) they would not have a material effect on the Company's operating results.  The 2003 Interpretive Release states, in pertinent part:

> As we have explained in prior guidance, disclosure of a trend, demand, commitment, event or uncertainty *is required unless* a company is able to conclude either that it is not reasonably likely that the trend, uncertainty or other event will occur or come to fruition, or that a material effect on the company's liquidity, capital resources or results of operations is not reasonably likely to occur.

166.    As detailed herein, given their high annual percentage rate, short-term nature, and high yields, Curo's single-pay loans were historically the Company's most profitable single line of business.  *See, e.g.*, ¶¶2-3, 9, 49, 93-94, 142.

167.    Prior to the beginning of the Class Period, Defendants understood that the Company was at risk of losing a material amount of its lucrative single-pay revenue stream in Canada when regulators and public advocates increasingly demanded that lenders provide consumers with more hospitable loans.  *See* ¶¶49-59.

168.    Indeed, the regulatory changes in Alberta, Ontario, and British Columbia began to adversely affect Curo's single-pay loan yields and revenues during 2017, particularly because Ontario, Canada is one of the Company's largest markets, accounting for approximately 13% of the Company's total revenues.

169.    Recognizing that these, and possible additional, regulatory changes were adversely impacting the Company's most profitable single line of business, Defendants, prior to the beginning of the Class Period, designed and implemented a strategic business initiative to transition borrowers away from Curo's single-pay loans and move them to installment and open-end loans.  *See* ¶¶60-78.

170.    As illustrated in the chart below, after Defendants implemented their strategic business initiative to transition borrowers away from single-pay loans, the amount of Curo's open-end loans skyrocketed, ***increasing nearly threefold in just nine months***, from $48 million at the end of December 2017 to $184 million at the end of September 2018:



171.    Given the Company's upfront provisioning methodology for open-end loans and the marketing expenditures it budgeted in advance to promote its rapid product transition initiative, Defendants *knew*, but failed to disclose, that the Company's operating results during the Class Period were reasonably likely to be adversely effected.

172.    This was particularly true because during the Class Period, Curo's Canadian operations accounted for a material amount of the Company's profitability.  For example, during 2017, the Company's Canadian operations accounted for approximately 20% and 55% of Curo's gross margin and pre-tax income, respectively.   During 2018, the Company's Canadian operations accounted for approximately 12% of Curo's gross margin and generated pre-tax income of approximately $17 million, while its U.S. operations generated pre-tax income of only $1.1 million and its U.K. operations generated a pre-tax loss of $38.7 million.

173.    After the Class Period ended, Curo disclosed that "[i]n Canada, the accelerated transition from Single-Pay to Open-End loans in Ontario was dilutive to Canadian earnings in the near term" and that the transition to open-end loans "came at the expense of single-pay loan balances."   Defendants also admitted that the Company's "disclosure controls and procedures

were not effective" and did not provide reasonable assurance "to ensure that information required to be disclosed in reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC rules and forms." This admission, along with the SEC's inquiry into "the Company's public disclosures surrounding its efforts to rapidly transition the Canadian inventory of products from single-pay loans to open end loans," provides further evidence that Curo's 1Q18 and 2Q18 10-Qs failed to disclose the information Curo was required to disclose under Item 303.

## IX.   ADDITIONAL SCIENTER ALLEGATIONS

174.    The following additional facts, when considered collectively with those alleged elsewhere herein, support a strong inference that Defendants knowingly made materially false or misleading statements and/or omissions, or acted recklessly in doing so, during the Class Period.

### A.    Defendants' Admissions Support an Inference of Scienter

175.    Defendants' scienter is supported by their own admissions.  For example, Defendants admitted that they knew or recklessly disregarded but failed to disclose to investors, that the Company's rapid transition from single-pay to installment and open-end loans in Canada would have a detrimental impact on Curo's operations and financial results, including its FY18 guidance.  Indeed, during the October 25, 2018 earnings conference call, Gayhardt apologized to investors for doing a "less than stellar" job "explain[ing]" the "near term" negative impact of the transition during the Company's April 27 and July 31, 2018 conference calls.  Defendants further admitted that despite reaffirming guidance on July 30 and July 31, 2018, the "majority" of the losses stemming from the Ontario transition (which caused the Company to alter its FY18 guidance) actually occurred in "July" of 2018, before Defendants reaffirmed guidance.

176.    Defendants also admitted that they could have "lessened" the negative "earnings impact" from the transition had they chosen to "grind this over a quarter or [two]" instead of

making the deliberate but undisclosed decision to rapidly accelerate the Ontario transition in 3Q18, despite the known, but concealed, operational risks.  Indeed, after the Class Period, during the November 8, 2018 Stephens Conference, Defendants admitted that they "intentional[ly]" refused to put any "speed-bumps" in place to moderate the speed of the transition in Ontario, due to fear of losing customers.  Defendants also admitted that the rapid transition to open-end loans in Canada "came at the expense of single-pay loan balances" and that the transition was "dilutive to Canadian earnings in the near term."

177.    Defendants have also admitted that the Company's "disclosure controls and procedures were not effective" and did not provide reasonable assurance "to ensure that information required to be disclosed in reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC rules and forms."   This admission, along with the SEC's inquiry into "the Company's public disclosures surrounding its efforts to transition the Canadian inventory of products from Single-Pay loans to Open-End loans," provides further evidence that Curo's 1Q18 and 2Q18 10-Qs failed to disclose the information the Company was required to disclose under Item 303 and that the SOX Certifications signed by Gayhardt and Dean attesting to the effectiveness of the Company's disclosure controls were false when made.

### B.    The Importance of Ontario, Canada to the Company's Operations

178.    Ontario was the Company's largest Canadian region, comprising two-thirds of the Company's Canadian revenues and nearly 13% of Curo's total consolidated revenues as of December 31, 2017.  Defendants knew that tightening regulations in Canada had the potential to materially impact Curo's operations and financial results.  Indeed, Defendants closely monitored changing regulations in Canada (and Ontario specifically), and discussed the Canadian regulatory environment in the Company's press releases and SEC filings.  Defendants also spoke

about the Canadian regulatory environment during their prepared remarks on every quarterly earnings call throughout the Class Period, and were asked and answered detailed questions by analysts about the topic.

179.   For example, Curo's Form 10-K, filed with the SEC on March 13, 2018 ("2017 10-K"), dedicated three pages to a discussion about "Canadian Regulations" and specifically discussed the new regulations in Ontario effective January 1 and July 1, 2018.  During the April 27 and July 31, 2018 earnings conference calls, Gayhardt discussed the new regulations in Ontario and told investors that the Company had "anticipated these changes."  Defendants' repeated reference to the Canadian regulations leading up to and throughout the Class Period supports the inference that they had personal knowledge of the regulatory changes in Canada and were monitoring any actual or potential impact to Curo's operations as a result.

180.   This inference is bolstered by the fact that Curo's Canadian single-pay loans were historically the Company's "most profitable single line of business," generating yields of almost 400% in the years leading up to the Class Period.  As Alberta, Ontario and British Columbia lowered the rates Curo could charge on payday loans, the yields on those loans declined dramatically and were hovering around 250% by 1Q18.  In fact, during the Stephens Conference, Defendants admitted that increasing regulations prompted Defendants to make a "real decision" regarding the profitability of single-pay loans in Ontario, Canada, which prompted the Ontario transition.   Given the importance of single-pay loans in Ontario to the Company's overall operations and financial condition, and Defendants' statements during the Stephens Conference, it is reasonable to infer that Defendants were closely involved in the decision to rapidly complete the transition to open-end loans and, therefore, knew or recklessly disregarded that the Company's operations and financial results would experience a negative, short-term impact as it

quickly transitioned away from its most profitable, high-yield product to lower yield, open-end loans.

### C.    Defendants' Substantial Experience and Monitoring of Test Markets

181.    Defendants also knew or recklessly disregarded that Curo's open-end loan product would be received favorably by customers in Ontario, which would result in more open-end loans with larger loan balances and, in turn, higher up-front provisioning.  *First*, the rapid transition in Ontario in 3Q18 was specifically timed to coincide with what was seasonally a quarter of increased demand in Canada.  As noted in the Company's 2017 10-K, historically Curo "typically experience[d]" its "highest demand in Canada in the third and fourth calendar quarters."  Dean acknowledged Defendants' understanding of Canada's seasonality on the April 28, 2018 conference call when he commented that Canada's earnings typically "pop back up in Q3 and Q4."

182.    *Second*, Defendants had years of experience with open-end loans and multiple months of data demonstrating the Canadian consumer's preference for such loans.  During the Stephens Conference, Defendants explained that the Company had been "operating a line of credit for 11 years" stating, we "know how to do" open-end loans.  In fact, prior to the Class Period, Curo had been offering open-end loans in the U.S. for five years.  Accordingly, Defendants had substantial experience with the performance of open-end loans from which to draw from, which would have informed their expectations for the performance of open-end loans in Canada.

183.    Additionally, since 4Q17, Defendants had been closely monitoring the conversion to open-end loans in Canada, beginning first in Alberta.  As a result of the transition in Alberta, Defendants "had a lot of experience in the data" Curo collected from its customers there before the Company "pulled the trigger on Ontario."  Further, prior to the beginning of the Class Period,

Curo also launched open-end test stores in Windsor, Ontario. Defendants closely tracked the performance and results of these test stores and markets, monitoring metrics like acquisition costs, credit performance, foot traffic, take-up rates, first-pay defaults, line utilization, adjusted EBITDA margins, revenue per store, and provision for losses. According to Defendants, the Windsor, Ontario test stores had "incredibly favorable" results with positive "take-up rates," good "conversion rates" from existing customers, and a "healthy number of new customers." Indeed, as Baker would later admit during the Stephens Conference, Defendants had "five months of seasoning in [the open end loan] universe in Ontario" before rapidly completing the majority of the transition in July.

184.    Moreover, during the transition in Ontario, Curo focused primarily on converting existing single-pay customers to open-end loans and, as a result, had access to pre-existing detailed customer data via the Curo Platform, including prior payment history, which Defendants called "the most predictive element" in gauging loan performance. In fact, Curo converted 38,000 existing single-pay customers to open-end loans in 3Q18 alone.

185.    *Third*, because Curo targets a highly vulnerable demographic as its customer base – nonprime, unbanked, or underbanked consumers with an immediate need for cash or who otherwise fail to qualify for traditional banking services – it should have come as no surprise to Defendants that Curo's single-pay customers would jump at the opportunity to have access to more cash, resulting in larger open-end loan balances and increased up-front provisioning. Specifically, Curo's average single-pay loan was approximately $600, while the average line of credit was approximately $2,400, with the average amount drawn of around $1,800, or three times the size of the average payday loan. And, unlike payday loans, which require a new application and loan when additional cash is needed, customers taking out a line of credit only have to apply once and, if approved, can request cash advances as often as they need up to the

available credit limit.  Based on these facts, it is reasonable to infer that Defendants knew or recklessly disregarded that the Company would experience a sudden increase in the amount of open-end loans when it rapidly completed the transition to open-end loans in Ontario in 3Q18.

186.   Defendants also knew or recklessly disregarded that as they made the deliberate decision to move up and rapidly complete the transition to open-end loans in Ontario, the Company's loss provisions would increase concomitantly with the increase in open-end loan balances.  Indeed, Defendants were well aware that the Company was required to take an up-front provision on the open-end loans it originated, as Defendants closely monitored loan loss provisions and reported both Company-wide and Canadian segment-specific loan loss provisions to investors as a performance metric in the Company's Class Period SEC filings and press releases.  Defendants also discussed loan loss provisions on quarterly conference calls throughout the Class Period, both in their prepared remarks and in response to analyst inquiries. *See, e.g.*, ¶¶98, 102-104, 119, 122, 124, 128-130.

187.   Defendants also knew or recklessly disregarded that the Company's aggressive multi-channel marketing plan, which was finalized at the end of June 2018, would result in more customers taking out open-end loans and cause an increase in the corresponding up-front provisioning as well as increased advertising costs, which would have a further negative impact on the Company's financials.  According to Baker, the Company had "absolute control of our marketing spend" and "there's not a dime that doesn't get spent that [Gayhardt] and [Dean] and I don't approve" and, therefore, Defendants would have known about the Company's plan to aggressively market open-end loans.  As to Ontario specifically, Gayhardt noted: "if you live in Ontario . . . unless you're kind of living in a cave, we think we've reached you multiple times with this advertising."  The cost of the Company's marketing strategy was reflected in its 3Q18 results, which reported a 37% increase in advertising costs from the prior quarter due to

"acquiring more installment and open-end customers versus single-pay," expanding "cable TV and direct mail spend and other media spend, especially in July" when the Company "introduced open-end in Ontario," and "new product expansion, including our LendDirect stores."

**D.    The Timing of Defendants' Statements and Magnitude of the Fraud**

188.    The timing of Defendants' statements and subsequent revelation of the truth is also indicative of scienter.  Defendants' statements on July 30, July 31, and August 2, 2018 (¶¶114-132, 134-136, *supra*) were made at a time when the Company's rapid transition to open-end loans in Ontario was substantially complete.  Defendants would have also had access to almost a month of actual results from the transition, including detailed customer data, average loan size, and open-end loan growth via the Curo Platform.  Accordingly, at the time Defendants affirmed guidance and assured investors that the "provision in the second half of the year would run about with revenue" and that "the provisioning should be in line with revenue," Defendants were aware that the "majority" of the losses stemming from the Ontario transition had already occurred in "July" of 2018.

189.    Further, just three months after affirming FY18 guidance and telling investors that the Company had a "very high degree of confidence in achieving our guidance objections," the Company lowered its 2018 EPS, adjusted net income, and adjusted EBITDA guidance as a result of the "allowance builds for line of credit product," *i.e.*, the up-front provisioning required for open-end loans.

190.    The magnitude of Curo's 3Q18 EPS and Canadian revenue shortfall is also indicative of scienter.  On October 24, 2018, Curo reported EPS of just $0.23, missing analysts' consensus ***by over 50%***.  Further, as Defendants disclosed, the Company's operating earnings were about "$17 million or $18 million short of our expectations, and approximately $12 million of that relates to our ongoing Canadian product migration and increased loan loss provisions

related to higher-than-expected loan growth."   Canada also experienced an 8.8% *decrease* in year-over-year revenue as a result of the accelerated transition to open-end loans.

E.   **Defendants Were Motivated to Maintain a Positive Market Perception of the Company**

191.   Defendants also were motivated to misrepresent and conceal Curo's true financial condition to facilitate and maximize the amount of funding Curo could raise on favorable terms from the $690 million Offering conducted during the Class Period.   On August 6, 2018, Curo announced that it intended to offer $675 million aggregate principal amount of its senior secured notes due 2025 in a private placement.   On August 13, 2018, Curo announced that it had "upsized" the private debt Offering from $675 million to $690 million aggregate principal amount and disclosed that the senior secured notes, due 2025, would have a coupon of 8.25%. The notes were sold to both qualified institutional buyers and foreign investors, and the Company immediately benefitted from the Offering, receiving proceeds of $690 million.   Curo used the proceeds of the Offering to extinguish its remaining $527.5 million 2017 12.00% Senior Secured Notes due 2022, to repay outstanding indebtedness from its U.S. SPV Facility's revolver balance of $42.4 million, and for general corporate purposes.   According to the Company, these actions generated "$20 million+ expected annual interest savings on the refinanced debt."

192.   The Offering terms would have been far less favorable to the Company had the market known the truth about Curo's decision to rapidly complete the transition to open-end loans in Ontario, which was hurting the Company's financial condition and had already made the Company's FY18 guidance unattainable.   For example, the Company claimed to investors that Curo's ability to successfully raise money to fund its business model by accessing capital markets was a "significant differentiator" from its peers, but had the bonds been priced at their true value, the Offering would have made less financial sense and been less advantageous to Curo.

193.    Likewise, Baker was also motivated to misrepresent and conceal Curo's true financial condition in order to maximize insider trading profits of almost *$1.8 million* during the Class Period.  Specifically, on September 25, 2018, Baker sold 51,168 shares of Curo common stock at an average price of $31.57.  The next day, on September 26, 2018, he sold 5,676 shares at an average price of $31.18 per share.  In total, over two days, one being when Curo common stock was trading at its all-time high, Baker sold 56,844 shares for proceeds of $1,792,351.

194.    Baker's Class Period stock sales were unusual in both timing and amount. Baker's sales occurred after the "majority" of the losses from the rapid transition in Ontario had occurred, but had not yet been revealed to investors, only days before the end of 3Q18, and approximately a month *before* Curo revealed the true negative impact of the Canadian transition, including, increased loan loss provisions, "dramatically" reduced Canadian single-pay revenues and lowered FY18 guidance.  Baker's sales were also unusual in amount, as he disposed of 100% of his vested common stock shares.  Although Baker reported beneficial ownership of 132,531 shares of common stock following the sales, those shares were "underlying restricted stock units."  Prior to his Class Period stock sales, Baker had not made any sales of Curo common stock since the Company's IPO in December 2017, and has not made any sales since.

195.    The fact that Baker's stock sales were made pursuant to a 10b5-1 insider trading plan does not negate an inference of scienter because the 10b5-1 plan was adopted during the Class Period, on or about August 2, 2018, immediately after the Company suffered the "majority" of its losses from the Ontario transition in July 2018, and two days after Defendants affirmed the Company's FY18 guidance.

X.    **LOSS CAUSATION/ECONOMIC LOSS**

196.    As detailed herein, Defendants' fraudulent scheme artificially inflated the price of Curo stock by misrepresenting and concealing both the rapid pace and the true extent of the

negative financial impact that the Company's transition from single-pay to installment and open-end products in Canada, particularly in Ontario, was having and would have on the Company's financial results and FY18 guidance.  Defendants' false or misleading statements and/or omissions, individually and collectively, concealed that the Company's rapid transition from high-yield, single-pay loans to lower yield, installment and open-end loans in Ontario caused higher up-front provisioning and increased marketing spend, which negatively impacted, among other things, Curo's net income and adjusted EBITDA, substantially weakening Curo's earnings and outlook.

197.    While each of Defendants' misrepresentations and omissions was independently fraudulent, they were all motivated by Defendants' desire to artificially inflate the Company's stock price and/or maintain the artificial inflation in Curo's stock and give the market the false notion that: the Canadian transition would occur smoothly over a number of years; any negative impact from the initiation of the transition would dissipate by 3Q18; any negative impact from the transition itself would not negatively affect the Company's financial results or ability to maintain and meet FY18 guidance; and Curo's Canadian single-pay loans would remain viable during and after the transition.  Defendants' false and misleading statements and omissions had the intended effect and caused, or were a substantial contributing cause of, Curo stock trading at artificially inflated levels, reaching as high as $31.33 during the Class Period on September 25, 2018.

198.    The truth emerged after the market closed on October 24, 2018, when, as detailed in ¶¶139-148 above, the Company shocked investors by issuing disappointing financial results for 3Q18 that missed analysts' consensus and lowering FY18 guidance.  Defendants attributed the negative financial impact to the rapid transition from single-pay to open-end loans in Ontario, which was completed in 3Q18 and required, among other things, significant up front

- 73 -

provisioning for loan losses and materially increased marketing spend.   Specifically, in the October 25, 2018 conference call, Defendants revealed that "by far the biggest impact to quarterly results was the ongoing product migration in Canada, specifically in the province of Ontario" and that the "majority" of the earnings losses came in "July" when the Company rapidly completed the Ontario transition.

199.   As a result of the information revealed to the market, the price of Curo stock dropped approximately 34%, or $7.69, falling from a close of $22.87 per share on October 24, 2018, to a close of $15.18 on October 25, 2018.   The decline in price of Curo stock was the direct result of the nature and extent of the revelations made to the market regarding the rapid acceleration of the Company's transition to open-end loans in Canada, and particularly Ontario, in 3Q18, which negatively impacted the Company's financial performance and 2018 outlook, that had been concealed or misrepresented by Defendants.

200.   The timing and magnitude of the stock price decline on October 25, 2018 negates any inference that the losses suffered by Plaintiff were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.   The point is supported by the chart below, which demonstrates the clear divergence of the price of Curo stock from the stock prices of Curo's self-identified peers ("Peer Index") as the revelation of the truth became known.[4]   Notably, Curo stock fell almost 34% on October 25, 2018, while the Company's Peer Index increased 0.15%:

---

[4]   The Peer Index is comprised of companies identified by Curo as its peer companies in the Company's Proxy Statement filed with the SEC on April 16, 2019.

**Curo Stock Performance vs. Peer Index Stock Performance**



201.    In sum, the rapid decline in the price of Curo stock on October 25, 2018 was the direct and foreseeable consequence of the revelation of the falsity of Defendants' Class Period misrepresentations and omissions to the market.   Thus, the revelations of truth, as well as the resulting clear market reaction, support a reasonable inference that the market understood that Defendants' prior statements were misleading.   In short, as the truth about Defendants' prior misrepresentations and concealments was revealed, the price of Curo stock quickly sank, the artificial inflation came out of the stock, and Plaintiff and members of the Class were damaged, suffering true economic losses.

202.    Accordingly, the economic losses, *i.e.*, damages, suffered by Plaintiff and Class members on October 25, 2018 were the direct and proximate result of Defendants' misrepresentations and omissions that artificially inflated the price of Curo stock and the subsequent significant decline in the value of the stock when the truth concerning Defendants' prior misrepresentations and fraudulent conduct entered the marketplace.

## XI.     APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE

203.    At all relevant times, the market for Curo stock was an efficient market for the following reasons, among others:

(a)     Curo common stock met the requirements for listing, and was listed and actively traded, on the NYSE, a highly efficient, electronic stock market;

(b)     as a regulated issuer, Curo filed periodic public reports with the SEC and the NYSE;

(c)     Curo regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Curo was followed by numerous securities analysts employed by major brokerage firms, including Credit Suisse, Stephens, Janney, Jefferies, and William Blair & Company, who wrote reports that were distributed to those brokerage firms' sales forces and certain customers of their respective brokerage firms.   Each of these reports was publicly available and entered the public marketplace.

204.    As a result of the foregoing, the market for Curo stock promptly digested current information regarding Curo from all publicly available sources and reflected such information in the price of the stock.   Under these circumstances, all purchasers of Curo stock during the Class Period suffered similar injury through their purchase of Curo stock at artificially inflated prices, and the losses they suffered when the artificial inflation was removed, and a presumption of reliance applies.

205.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972), because

the Class' claims are grounded on Defendants' material omissions.  Because this action involves Defendants' failure to disclose material, adverse information regarding Curo's business and operations – information that Defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## XII.  NO SAFE HARBOR

206.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false or misleading statements alleged herein.  Many of the statements alleged were not identified as "forward-looking" when made, and, to the extent any statements were forward-looking, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

207.   Indeed, the risk warnings that were provided by Defendants in their Class Period statements included boilerplate statements,[5] such as:

- Our substantial indebtedness could adversely affect our business, results of operations and financial condition.

- If our allowance for loan losses is not adequate to absorb our actual losses, our results of operations and financial condition may be adversely affected.

- Our business and results of operations may be adversely affected if we are unable to manage our growth effectively.

- Our lending business is somewhat seasonal, which causes our revenues to fluctuate and may adversely affect our ability to service our debt obligations.

---

[5]   *See* Curo's 2017 10-K, at Part 1. Item 1A ("Risk Factors").  The 2017 10-K was incorporated by reference into the Company's 1Q18 10-Q and 2Q18 10-Q

- The international scope of our operations leads to increased cost and complexity, which could negatively impact our operations.

- The market price of our common stock is likely to be volatile and could decline, resulting in a substantial loss of your investment.

- Our industry is strictly regulated everywhere we operate, and these regulations could have an adverse effect on our business and results of operations.

- The regulations to which we are subject change from time to time, and future changes, including some that have been proposed, could restrict us in ways that adversely affect our business and results of operations.

- Existing or new local regulation of our industry could adversely affect our business and results of operations.

208.    These or other materially similar risk disclosures were disseminated throughout the Class Period and did not serve to adequately inform the market of the true risks and actual operational experience of the Company.  Indeed, that these stated warnings were inadequate and provided no new, meaningful information, is evident from the market's reaction to the revelation of Defendants' untrue and/or misleading statements.  *See, e.g.*, ¶¶196-202.

209.    Alternatively, to the extent that the statutory safe harbor applies to any forward-looking statements alleged, Defendants are liable for such statements because, at the time they were made, the speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Curo who knew that the statement was false when made.  Moreover, to the extent that Defendants issued any disclosures designed to warn or caution investors of certain purported risks, those disclosures were also false and misleading since they did not disclose that Defendants were actually engaging in the very actions about which they purportedly warned and/or had actual knowledge of material, adverse facts undermining such disclosures.

## XIII.   CLASS ACTION ALLEGATIONS

210.   Plaintiff brings this action as a class action pursuant to Rule 23(a) and (b)(3) of Federal Rules of Civil Procedure on behalf of a Class consisting of all those who purchased Curo common stock between April 27, 2018 and October 24, 2018, inclusive, and who were damaged thereby.  Excluded from the Class are Defendants, the Founder Defendants, the FFL Defendants, the officers and directors of the Company, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which any defendants have or had a controlling interest.

211.   The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Curo stock was actively traded on the NYSE. While the exact number of Class members can only be determined by appropriate discovery, Plaintiff believes that the number of Class members is at least in the thousands and that they are geographically dispersed.  Record owners and other members of the Class may be identified from records maintained by Curo or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

212.   Plaintiff's claims are typical of the claims of the other members of the Class because all Class members are and were similarly affected by defendants' wrongful conduct in violation of federal law, as alleged herein.

213.   Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

214.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as

the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

215.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)    whether defendants' publicly disseminated press releases and statements during the Class Period omitted and/or misrepresented material facts;

(c)    whether defendants failed to convey material facts or to correct material facts previously disseminated;

(d)    whether defendants participated in and pursued the fraudulent scheme or course of business complained of herein;

(e)    whether defendants acted knowingly or with severe recklessness in omitting and/or misrepresenting material facts;

(f)    whether the market prices of Curo stock during the Class Period were artificially inflated due to the material nondisclosures and/or misrepresentations complained of herein; and

(g)    whether the members of the Class have sustained damages and, if so, what is the appropriate measure of damages.

**COUNT I:**
**VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT**
**AND RULE 10b-5 PROMULGATED THEREUNDER**
**AGAINST CURO AND THE INDIVIDUAL DEFENDANTS**

216.    Plaintiff repeats and realleges the allegations in ¶¶1-215 above, as if fully set forth herein.

217.    During the Class Period, Curo and the Individual Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

218.    Curo and the Individual Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's stock during the Class Period.

219.    In addition to the duties of full disclosure imposed on Curo and the Individual Defendants as a result of their affirmative false and misleading statements to the public, Curo and the Individual Defendants had a duty to promptly disseminate truthful information with respect to Curo's operations and performance that would be material to investors in compliance with the integrated disclosure provisions of the SEC, including with respect to the Company's revenue and earnings trends, so that the market prices of Curo stock would be based on truthful, complete, and accurate information.  SEC Regulations S-X (17 C.F.R. § 210.01, *et seq.*) and S-K (17 C.F.R. § 229.10, *et seq.*).

220.    As a direct and proximate result of Curo's and the Individual Defendants' wrongful conduct, Plaintiff and the Class have suffered damages in connection with their

respective purchases of Curo stock during the Class Period because, in reliance on the integrity of the market, they paid artificially inflated prices for Curo stock and experienced losses when the artificial inflation was released from Curo stock as a result of the revelations and price decline detailed herein. Plaintiff and the Class would not have purchased Curo stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Curo's and the Individual Defendants' misleading statements.

221.    By virtue of the foregoing, Curo and the Individual Defendants have each violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

**COUNT II:**
**VIOLATION OF SECTION 20(a) OF THE EXCHANGE ACT**
**AGAINST THE INDIVIDUAL DEFENDANTS, THE FOUNDER**
**DEFENDANTS, AND THE FFL DEFENDANTS**

222.    Plaintiff repeats and realleges the allegations set forth in ¶¶1-215 above, as if fully set forth herein.

223.    The Individual Defendants, the Founder Defendants, and the FFL Defendants acted as controlling persons of Curo within the meaning of Section 20(a) of the Exchange Act.

224.    By virtue of their high-level positions as officers and/or directors of Curo and/or their substantial ownership of Curo stock; participation in, awareness of, and ability to control the Company's policies and operations; and/or their intimate knowledge of the false and misleading statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants, the Founder Defendants, and the FFL Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiff contends are false and misleading. The Individual Defendants, the Founder Defendants, and the FFL Defendants (either directly or through their representatives on the Board) were provided with, or had unlimited access to copies of, the Company's reports, press releases, public

filings, and other statements alleged by Plaintiff to be misleading before and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

225.   The Founder Defendants and the FFL Defendants further controlled Curo by virtue of their share ownership, power to appoint the entire Board and management of the Company, and historical and professional relationships with Curo.   For example, in the Company's prospectus in connection with the Selling Stockholders Offering, Curo stated:

> As a result [of their share ownership], the FFL Holders and the Founder Holders collectively have the ability to elect all of the members of our board of directors and thereby control our policies and operations, including the appointment of management, future issuances of our common stock or other securities, the payment of dividends, if any, on our common stock, the incurrence or modification of debt by us, certain amendments to our amended and restated certificate of incorporation and amended and restated bylaws, and the entering into of extraordinary transactions, and their interests may not in all cases be aligned with your interests.

226.   The Founder Defendants also signed the registration statement in connection with the Selling Stockholders Offering, which is alleged to have contained false and misleading statements and omissions.

227.   As set forth above, Curo and the Individual Defendants violated Section 10(b) and Rule 10b-5 promulgated thereunder by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, and as a result of their aforementioned conduct, the Individual Defendants, the Founder Defendants, and the FFL Defendants are liable pursuant to Section 20(a) of the Exchange Act for the Section 10(b) violation alleged herein.  As a direct and proximate result of these defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of Curo stock during the Class Period, as evidenced by, among others, the stock price decline alleged above, when the artificial inflation was released from the price of Curo stock.

228.   By reason of such conduct, the Individual Defendants, the Founder Defendants, and the FFL Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment as follows:

A.   Determining that this action is a proper class action, certifying Plaintiff as Class representative under Rule 23 of the Federal Rules of Civil Procedure, and designating Lead Counsel as Class Counsel;

B.   Awarding compensatory damages in favor of Plaintiff and other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.   Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.   Awarding such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED AND DESIGNATION OF PLACE OF TRIAL

Plaintiff hereby demands a trial by jury.  Pursuant to Local Rule 40.2(a), Plaintiff designates Kansas City, Kansas as the place of trial.

DATED: May 31, 2019                    STUEVE SIEGEL HANSON LLP

                                       *s/ Rachel Schwartz*
                                       NORMAN E. SIEGEL, D. Kan. #70354
                                       RACHEL E. SCHWARTZ, KS #21782
                                       460 Nichols Road, Suite 200
                                       Kansas City, MO 64112
                                       Telephone:  816/714-7100
                                       816/714-7101 (fax)
                                       siegel@stuevesiegel.com
                                       schwartz@stuevesiegel.com

                                       Local Counsel for Lead Plaintiff

ROBBINS GELLER RUDMAN
  & DOWD LLP
JACK REISE (admitted *pro hac vice*)
KATHLEEN B. DOUGLAS
(admitted *pro hac vice*)
120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
Telephone:  561/750-3000
561/750-3364 (fax)
jreise@rgrdlaw.com
kdouglas@rgrdlaw.com

Lead Counsel for Lead Plaintiff

CAVANAGH & O'HARA
JOHN T. LONG
2319 West Jefferson Street
Springfield, IL  62702
Telephone:  217/544-1771
217/544-9894 (fax)
johnlong@cavanagh-ohara.com

Additional Counsel for Lead Plaintiff

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on May 31, 2019, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which sent notification of such filing to all counsel of record.

*s/ Rachel Schwartz*
NORMAN E. SIEGEL, D. Kan. #70354
RACHEL E. SCHWARTZ, KS #21782
460 Nichols Road, Suite 200
Kansas City, MO 64112
Telephone:  816/714-7100
816/714-7101 (fax)
siegel@stuevesiegel.com
schwartz@stuevesiegel.com

Local Counsel for Lead Plaintiff